(No. 20222.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* MEYER GORDON, Plaintiff in Error.

*Opinion filed June 18, 1931.*

NASH & AHERN, (FRANKLIN J. STRANSKY, of counsel,) for plaintiff in error.

OSCAR E. CARLSTROM, Attorney General, JOHN A. SWANSON, State's Attorney, J. J. NEIGER, and JAMES B. SEARCY, (EDWARD E. WILSON, JOHN HOLMAN, GRENVILLE BEARDSLEY, and CHARLES J. MUELLER, of counsel,) for the People.

Mr. JUSTICE DEYOUNG delivered the opinion of the court:

Meyer Gordon, William Norton and John Morgan were indicted in the criminal court of Cook county upon two counts, the first of which charged robbery while armed with a pistol, and the second, receiving stolen property of the value of $1890. Morgan was granted a separate trial. The first count was dismissed as to Gordon, and a jury found him guilty upon the second count of receiving stolen property of a value in excess of $15. Norton was found not guilty. Judgment was rendered on the verdict and Gordon prosecutes this writ of error for a review of the record.

On November 22, 1928, the jewelry store of Olsen & Ebann, at 6520 South Halsted street, Chicago, was robbed of certain jewelry. Morgan, one of the persons indicted for the crime, was called as a witness by the prosecution. He testified that the robbery was committed by himself, Norton, James Martin and James Burke; that he, Morgan, had been twice convicted of burglary, once in Louisiana and at another time in California, and had served terms of imprisonment in the penitentiaries of both States; that he became acquainted with Martin in the penitentiary at Folsom, California, while the latter was serving a life sentence; that after Morgan's discharge from imprisonment he came to Chicago where he met Martin, who had been granted a parole and had escaped from a road camp; that Martin introduced him to the plaintiff in error at the latter's store, No. 703 North Clark street, Chicago, late in December, 1927, or early in January, 1928; that thereafter Morgan called at the store several times accompanied either by Martin

or by one John Tahor; that a few days prior to November 22, 1928, Morgan conferred with the plaintiff in error concerning the proposed robbery of Olsen & Ebann's store, and the plaintiff in error said he thought the plan was feasible; that after the robbery was committed Morgan and the other participants in the crime went to Martin's room at 6408 Drexel avenue, Chicago, from which Martin called some person twice on the telephone; that after the second call the plaintiff in error appeared at the room and the stolen jewelry was exhibited to him spread out on a bed; that he inspected the jewelry, asked the price and when $3000 was suggested, he said the figure was too high and that he would not give more than $2700 for it; that his offer was accepted, he wrapped the jewelry in two handkerchiefs and took it away stating that it was too late to pay the money that day but if Morgan would come to his store the next forenoon he would pay him; that Morgan went to the store as suggested and was given a check for $2400, the price agreed upon less $300 which Morgan owed the plaintiff in error; that the check was made payable to "cash" and on the back appeared the signature and business stamp of the plaintiff in error, and that Morgan went to the bank, received $2400 upon the check and gave Norton, Burke and Martin each $675. Morgan further testified that about the middle of March, 1928, he sold the plaintiff in error jewelry stolen by himself, Martin and Tahor from Rasens' shop at Drexel boulevard and Forty-third street; that when the three men went to the store of the plaintiff in error after that robbery Max Holman, his clerk, was present and he offered $150; that shortly thereafter the plaintiff in error walked in and said he would give $275; that Morgan told where the jewelry had been obtained and Holman then said, in the presence of the plaintiff in error, "If you get anything else at any time, no matter what it is, I will take it;" that thereafter Morgan, Martin and Tahor robbed a man at Drexel boulevard and Forty-fourth street of two

diamond rings, a stick-pin and a watch; that Morgan and Tahor went to the store of the plaintiff in error with the rings and pin and he first offered $650 for them, but later, upon a telephonic request by Martin, he raised his offer to $750 and bought the three articles at that price; that Morgan, Martin and Tahor next robbed Bertha Jordan, in her home on Luella avenue, of three diamond rings; that Morgan took the jewelry to the plaintiff in error who offered $900, but that Martin again telephoned him and he agreed to give $1000 for it; that Tahor asked Morgan to get the money, but the latter declined, stating that he had called at the store of the plaintiff in error too often and it was not a good place for him to be seen, and that Tahor then obtained a check for $1000 which he, accompanied by the plaintiff in error, cashed at the bank. Morgan also testified that he had borrowed money from the plaintiff in error at different times; that there was an understanding between them to the effect that if he needed money when absent from Chicago, he should telegraph that he was "making a shipment to-day" so that the plaintiff in error would know the telegram actually came from Morgan, and that the latter, after calling the plaintiff in error by telephone from Louisville, Kentucky, on the first or third of December, 1928, obtained $50 from him by telegraph. On cross-examination Morgan stated that after his arrest he was subjected to physical torture by the police.

The plaintiff in error conducted his store under the name of Pals Re-Sale Shop. He kept an account in the Cosmopolitan State Bank so entitled and the prosecution introduced in evidence two sheets from the bank's records showing portions of that account. One of these sheets covering the period from March 17 to April 11, 1928, showed twenty-five deposits ranging from $37 to $4148.75, and fifty-three withdrawals by check, the largest of which was $5000. The other sheet showed that between November 9 and December 6, 1928, there were twenty-four de-

posits varying from $30.15 to $5077.36 and seventy-two withdrawals ranging from 26 cents to $3000. The balance to the depositor's credit at the end of the first period was $6021.96 and at the termination of the second was $5937.97. The first sheet showed that on March 31, 1928, $1018.26 was deposited and $1000 was withdrawn, and the second, that on November 23, 1928, the deposits amounted to $2863.25 and the withdrawals to $2813. The sum last mentioned was paid out on three checks, one of which was for $2400.

The prosecution introduced in evidence two telegrams from Morgan at Dallas, Texas, dated October 23, 1928, addressed to the plaintiff in error at his store in Chicago. The first, sent in the forenoon, contained the statement "Shipped you to-day enough to square accounts," and requested an immediate remittance by telegraph of $50. In the second, sent in the afternoon, Morgan said that his train departed at five-forty o'clock, that he must have $50 and he renewed his request for its immediate remittance by telegraph. An order, dated Chicago, December 1, 1928, signed by the plaintiff in error and directing the Western Union Telegraph Company to pay to J. E. Morgan, Brown Hotel, Louisville, Kentucky, $50, and the company's check issued at Louisville on the same day for $50, payable to J. E. Morgan and endorsed by him, were also introduced in evidence by the State. The plaintiff in error admitted that he received copies of the two telegrams from Dallas and that he made the remittance to Morgan on December 1, 1928.

William J. Cusack, a detective of the Chicago police department, testified that he and other police officers, including officer John F. Mangin, arrested the plaintiff in error at his store on January 12, 1929, and took him to the detective bureau; that Bertha Jordan was present and the plaintiff in error talked with her; that the substance of their conversation was that the plaintiff in error could recover

her large canary diamond ring but not the other two because several months had elapsed since their disappearance; that the plaintiff in error asked officer Cusack whether, if he adjusted the matter with Miss Jordan, it would be satisfactory and the officer replied that the plaintiff in error would be tried on the charge laid against him; that the latter thereupon said if such was the case he would retain an attorney; that on the next day officer Cusack told him that Morgan was about to make a statement; that the plaintiff in error answered he would make no statement but would consult a lawyer and that he wished to withdraw anything he had said concerning the case. Officer Cusack further testified that when Morgan made his statement, the plaintiff in error was present but remained silent.

From the testimony of Bertha Jordan it appears that on March 29, 1928, she was robbed of one large and three other diamond rings and a bar ring by Morgan and Martin; that she first saw the plaintiff in error at the detective bureau on January 12, 1929; that he thought he could bring about the return of her large diamond ring but not of the others because a long period of time had elapsed since the robbery, and that he would make restitution for the smaller rings. On cross-examination she testified that the plaintiff in error said he did not think there was much chance to recover the jewels because of the lapse of time since she was robbed of them; that he felt sorry for her and if there was anything he could do, he would be glad to assist her; that she was present at the bureau when Morgan said he had given the plaintiff in error some of the jewelry and that on the next day the latter denied the receipt of any jewelry from Morgan and asserted that Morgan's statements implicating him were false.

The plaintiff in error testified that he first became acquainted with Morgan in the fall of 1928 when the latter introduced himself as having been sent by one Blumenthal, the president of the Illinois Welding Works; that Morgan

selected a cloisonne toilet set for his wife, and returned a day or two later, made a deposit of $50 upon it, and said that, since he was leaving town, he might remit the balance by money order; that thereafter he received two telegrams from Morgan asking for money, but he made no reply to either of them; that on December 1, Morgan called him by telephone from Louisville, Kentucky, stating that he was there with his wife and son without money and requesting him to refund the $50 deposited by him on his purchase and that he would adjust the matter upon his return to Chicago; that the plaintiff in error complied with the request and sent the money by telegraph; that after his return Morgan called at the store and bought a small musical instrument and when the plaintiff in error asked him what he meant by the statement in his first telegram concerning a shipment to square accounts, he answered that it was written in jest. The plaintiff in error further testified that when he was taken to the detective bureau after his arrest, officer Cusack said he was not interested in Olsen & Ebann's jewelry but in Miss Jordan's diamond rings; that the plaintiff in error told the officer and Miss Jordan that he knew nothing about her diamonds, and he said nothing respecting the difficulty of recovering them; that he emphatically denied the statements made by Morgan and he never bought any jewelry from him; that the check for $1000, dated March 31, 1928, represented a loan to Herman Cohn, a bond broker at Clark and Erie streets, by whom the plaintiff in error had been employed for twelve years; that he had made a loan to Cohn as often as once a month for six years; that he signed the check for $2400, dated November 22, 1928, and cashed it at the bank; that his infant child had been ill since August and his wife and children intended to go to Florida the first of December; that the check was drawn to pay for their reservations, clothing and other expenses, except that he retained $400 for use in his business, and that there was a recurrence of the child's

illness late in November and for that reason the trip was postponed until early in January when his wife and children finally went to Florida. The plaintiff in error testified that he had never seen or met either Martin or Tahor prior to the time he was taken to the detective bureau, and that he held no conversations with Morgan other than those to which he had testified.

The check for $1000, dated March 31, 1928, and the check for $2400, dated November 22, 1928, were introduced in evidence. On the back of the first appeared the endorsement of Herman Cohn and under that endorsement the stamp and signature of the plaintiff in error. Cohn testified that this check represented money which he borrowed from the plaintiff in error, and that he re-paid the loan in a few days. The reverse side of the check for $2400 was blank and hence it bore no endorsement whatever.

Max Holman, the clerk of the plaintiff in error, denied that Morgan ever had a conversation with him regarding the purchase of stolen jewelry. John Tahor testified that he had been imprisoned in the penitentiary at Folsom, California, for burglary, and met Morgan there; that he never saw the plaintiff in error before January, 1929, and that he never went to his store with Morgan or to the bank with the plaintiff in error to cash a check. William Norton testified that in 1927 and 1928 he operated a bus ticket brokerage business at 28 South Canal street and 513 West Madison street, Chicago; that he first became acquainted with Morgan after their arrest on the present charge; that he never aided or participated in the robbery of Olsen & Ebann's store or any other robbery; that he was acquainted with James Burke, who was a competitor in business and who threatened his life; that he went to St. Louis, where he was arrested; that he asked Morgan in court why he implicated him in the robbery of Olsen & Ebann's store, and Morgan answered that if Norton had suffered his experiences, he would implicate his mother.

Morgan's statement, made under cross-examination, that he had worked for Maurice Leeney, a cartage contractor, and at the Illinois Welding Works, of which Blumenthal was president, was refuted. George Marback testified that he was employed by Leeney from December, 1927, until April, 1928; that his duties were to repair trucks at night that had been disabled during the day, and that he never saw a man named Morgan employed by Leeney to do mechanical work. G. H. May testified that he was the superintendent of the Illinois Welding Works School; that Morgan had never been an employee of the company and that the only work he ever did for it was to couple a motor on a certain occasion when he visited Blumenthal.

The plaintiff in error contends that the verdict and judgment rest upon the uncorroborated testimony of Morgan, an accomplice, whose credibility was impeached and hence that the judgment has no sufficient basis to support it. Morgan testified that he had served terms of imprisonment in penitentiaries in Louisiana and California for burglaries which he had committed; that after his release from the second imprisonment he came to Chicago and robbed successively a jewelry shop, a man on the public street, a woman in her home and the jewelry store of Olsen & Ebann. Obviously his career as a professional criminal tends to impair his credibility. Moreover, his testimony not only lacks corroboration, but it was impeached in many respects. He testified that after he, Martin and Tahor had robbed Miss Jordan of diamonds and jewelry, the plaintiff in error agreed to pay $1000 for them; that because he had entered the store too often and it was an undesirable place for him to be seen, Tahor obtained the sale price by check and, accompanied by the plaintiff in error, cashed the check at the bank. The particular check was endorsed by Herman Cohn, to whom the plaintiff in error, at the time, according to the testimony of Cohn and himself, lent the sum of money for which the check was drawn. Tahor denied that he ever met

the plaintiff in error prior to the latter's arrest in January, 1929, or that he entered his store with Morgan or cashed a check drawn by the plaintiff in error at any time. Moreover, if Morgan was reluctant to enter the store of the plaintiff in error on the last day of March, his successive crimes, it seems, would inspire greater caution in subsequent visits to the same store.

Morgan's testimony with respect to the payment of $2400 by the plaintiff in error for jewelry stolen from Olsen & Ebann likewise is not persuasive. He was not certain whether his first statement at the detective bureau was that he received that amount from the plaintiff in error in money or by check. Alexander Lorimer, a Pinkerton detective, called by the prosecution, testified on cross-examination that Morgan stated at the detective bureau that he was paid in money in "tens, twenties and fifties" and that he did not utter "a single word about going to the Cosmopolitan Bank and getting a check cashed." On the back of the check, Morgan testified, appeared the stamp "Pals Re-Sale Shop, 703 North Clark street," and the signature of the plaintiff in error. The only check for $2400 drawn by the plaintiff in error was neither stamped nor endorsed for the back of the check was entirely blank. Morgan admitted that he saw a statement of the bank account of the plaintiff in error after he appeared at the detective bureau. Such a statement would disclose the amounts of the checks he issued and the dates on which they were paid, but not the endorsements on the backs of the checks. It is probable, therefore, that such information as Morgan had with respect to checks drawn by the plaintiff in error was derived from the statement which had been exhibited to him.

The lack of corroboration of Morgan's testimony is emphasized when the fact is considered that many of his assertions were contradicted by other witnesses. He implicated Norton in the robbery of Olsen & Ebann's store and said he paid him $675 as his share of the proceeds.

Norton denied that he ever participated in any robbery or received any money whatever from Morgan. The jury believed Norton and acquitted him of Morgan's charge. According to Morgan's testimony, Holman, the clerk of the plaintiff in error, said he was ready to buy stolen jewelry at any time. Holman denied that such a conversation had ever been held. May and Harback declared that Morgan had not been employed by their respective employers as he claimed; and his charge that the police had tortured him physically was denied by officer Mangin and detective Lorimer.

The testimony of an accomplice is competent, but it is subject to grave suspicion and should be acted upon with great caution. The jury should carefully consider such testimony in the light of all the other evidence in the case and the influence under which the testimony is given, and determine whether the purpose of the witness is to shield himself from punishment, to obtain some personal benefit or advantage, or to gratify his malice. If, after all the facts and circumstances in evidence are considered, such testimony uncorroborated is of such a character as to prove guilt beyond a reasonable doubt, it will authorize a verdict of guilty. (*People* v. *Elmore,* 318 Ill. 276; *People* v. *Mc-Kinney,* 267 id. 454; *People* v. *Rosenberg,* 267 id. 202). Convictions on the uncorroborated testimony of an accomplice, however, will not be sustained unless the record is substantially free from prejudicial error. *People* v. *Mc-Geoghegan,* 325 Ill. 337; *People* v. *Johnson,* 314 id. 486; *People* v. *Crane,* 302 id. 217.

The contention is made that the prosecuting attorneys were guilty of misconduct which was prejudicial to the plaintiff in error and that the latter's motions to withdraw a juror, based upon such misconduct, were erroneously denied. William Norton, a co-defendant, who testified in behalf of the plaintiff in error as well as of himself, stated on cross-examination that he was arrested at the Biltmore Ho-

tel, in St. Louis. No reference had been made to guns on the direct examination of the witness, and yet an assistant State's attorney asked him, "How many guns did you have in your possession?" Counsel for the plaintiff in error objected to the question and the objection was sustained. A motion to withdraw a juror followed but the motion was denied. At the opening of the cross-examination of Max Holman, the clerk of the plaintiff in error and a witness in his behalf, Holman was asked by another assistant State's attorney, "You are defendant in three or four cases here, are you not?" No evidence had been adduced that Holman was a defendant in any case. Upon objection to the question by counsel for the plaintiff in error the jury were excluded, and after a discussion at the conclusion of which the court informed the assistant State's attorney that the question was highly improper, and after calling his attention to the question concerning guns asked Norton by an associate earlier in the day, admonished him not to persist in such a course. Counsel for the plaintiff in error made a motion to withdraw a juror which was denied. Thereafter the jury returned to the court room, the objection was sustained and the jury were instructed to disregard any inferences that might be drawn from the question asked.

The plaintiff in error testified that on the day after he was arrested, officer Cusack, detective Lorimer and one Healy, the attorney for the Jewelers' Association, came to his cell and Healy said, "Well, Gordon, we finally got you. This will even up scores." From the testimony of the plaintiff in error it further appeared that he had been a witness for the defendant in a case which Healy and an assistant State's attorney prosecuted and in which the Jewelers' Association was interested. The same assistant State's attorney, in the course of his cross-examination of the plaintiff in error in the present case asked: "Now, as a matter of fact, Mr. Witness, isn't this what Mr. Healy said: 'We finally got you. You are the man that we have evidence

against that framed the Illinois Central robbery,' isn't that what he told you?" Counsel for the plaintiff in error objected to the question and moved to withdraw a juror, whereupon the assistant State's attorney remarked, "I am ready to prove what I have asked this man, in view of him opening the door and asking him, having him telling the court and jury what was said, we have a different version of it and we will produce a witness to that effect." The court said: "Strike out the last part of the question; the last part of the answer," and the motion to withdraw a juror was denied. The plaintiff in error was arrested after he appeared as a witness for the defendant in the earlier case and on the next day he was discharged. In this case an assistant State's attorney, on cross-examination, inquired of him whether he thought attorney Healy was concerned in that arrest, and his answer was in the affirmative. To a further question, whether the police officer who made the arrest told him that he was arrested on suspicion, he answered in the negative. The assistant State's attorney then asked: "Because of the word that they received from Florida that a man was arrested down there, because the jewelry that he obtained, he obtained from you?" An objection to the question and a motion to withdraw a juror were made. The objection was sustained but the motion was denied. No evidence had been offered either of an Illinois Central robbery or of the sale or delivery of stolen jewelry to any person in Florida. Evidence of such crimes, even if committed, prosecuting counsel well understood would not be competent in the present case. Their purpose in making reference to them obviously was to create an unwarranted prejudice in the minds of the jury against the plaintiff in error.

When the evidence upon which the prosecution relies is the testimony of an accomplice, the record should be substantially free from the palpable efforts of prosecuting counsel to introduce into the case matters wholly foreign and

irrelevant, the sole effect of which is to prejudice the jury against the defendant. Many questions asked the plaintiff in error and his witnesses on cross-examination, some of which have been noted, were of that character, and had no tendency to prove his guilt of the crime charged. A person charged with a particular crime is not required to defend himself against every aspersion which may be made against him, nor are witnesses to be subjected to insinuations in no way connected with the issue to be determined. The question is not what, with the aspersions wrongfully appearing in the record, we may think of the guilt or innocence of the plaintiff in error, but what would the jury have done if the case had been submitted to them without those aspersions. The plaintiff in error had the right to be tried by the law of the land, and a conviction secured by a trial in total disregard of that law cannot be sustained. (*People* v. *Newman,* 261 Ill. 11; *People* v. *Lewis,* 313 id. 312; *People* v. *Decker,* 310 id. 234; *People* v. *Brocamp,* 307 id. 448; *People* v. *Green,* 292 id. 351; *People* v. *Reed,* 287 id. 606, and *People* v. *King,* 276 id. 138.) The evidence was in direct conflict and while the trial court sustained objections to many of the improper questions propounded by the prosecution, yet such questions occurred too often to insure a fair trial. The only remedy for such conduct is a reversal of the judgment so that a fair and orderly trial under the law may follow. (*People* v. *Green, supra*). Upon such a trial, the merits of the case may be determined free from the influence of improper attempts to go into matters other than the accused person's guilt of the crime charged in the indictment.

The judgment of the criminal court is reversed and the cause is remanded to that court.

*Reversed and remanded.*