(No. 25037.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* JAMES K. MATTER, Plaintiff in Error.

*Opinion filed April 17, 1939.*

WM. SCOTT STEWART, for plaintiff in error.

JOHN E. CASSIDY, Attorney General, THOMAS J. COURTNEY, State's Attorney, and A. B. DENNIS, (EDWARD E. WILSON, JOHN T. GALLAGHER, MELVIN S. REMBE, and BLAIR L. VARNES, of counsel,) for the People.

Mr. JUSTICE GUNN delivered the opinion of the court:

The plaintiff in error, James K. Matter, was indicted in Cook county for the crime of murdering his wife, Marguerite Matter, by shooting her with a rifle on October 1, 1938. He was convicted of murder and the jury fixed his punishment at twenty years in the penitentiary. Motions for new trial and in arrest of judgment were overruled and plaintiff in error was sentenced to the penitentiary. He sues out a writ of error to this court.

All of the evidence in the case is circumstantial. The proof shows that plaintiff in error was a married man with three children, aged ten, four and two years, respectively. The oldest child was a daughter, Martha. Plaintiff in error was an industrial engineer and held degrees from two well-known universities. He had been out of employment for some time. A short time previous to the homicide an opportunity presented itself by which there was a possibility of again being employed at good wages. About two months

before the day of the homicide he had fallen and broken a bone in his heel, which caused him a great deal of pain, and he was required to wear a cast in order to brace the heel while the bone was healing. About two days before the killing, the cast had been taken off and Matter started to walk to the place of prospective employment for an interview, but on the way the pain in his foot became so intense that he had to return home and go to bed. His physician had from time to time prescribed a narcotic to ease the pain, and he asked his wife to go to the doctor's office and get some morphine. She was opposed to the use of narcotics, as well as liquors, and a quarrel ensued. He went upstairs to his room to go to bed and she remained downstairs. In the course of the evening he procured a fifth of a gallon of gin. About 6:00 o'clock in the evening his wife sent the daughter, Martha, upstairs with a plate of something to eat and he refused to eat it. About that time a neighbor by the name of Peterson came in with his wife, and Matter called to Peterson to come upstairs. He hastily ate the food, as he says, to prevent the neighbors from knowing he and his wife were having a quarrel. Mrs. Matter had, during the afternoon, procured the narcotic, but he declined to use it. Peterson was a man employed in the same line of business and they talked awhile. During the course of the evening Matter took three large drinks of gin raw, with water following, consuming, as his statement shows, about one-half of the one-fifth.

The sleeping rooms were all upstairs and Matter and his wife occupied one large room in which were two beds. The daughter, Martha, occupied a room about fifteen feet down the corridor, with a little hallway about six and one-half feet to the left. Both of these rooms had doors which opened upon the corridor. During the early part of the evening plaintiff in error had been amusing his four-year-old son, Jimmie, who had found a broken air rifle. Plaintiff in error had in the room an army rifle using World

War ammunition, and he got this out and let the little boy pull the trigger and snap it. The little girl, Martha, went to bed about 8:30. What time the wife came up is not exactly disclosed by the evidence. About 10:15 plaintiff in error called up his doctor and told him to come over at once as a terrible accident had occurred in which his wife had suffered a gunshot wound. The doctor came over, went upstairs and found Mrs. Matter lying on one of the beds, dead, from a rifle bullet which had entered her chest between the third and fourth ribs, penetrated her heart, and came out behind between the eighth and ninth ribs. The doctor found the rifle on the floor at the foot of the bed. There is no evidence in the record that more than one shot was fired from the rifle. The course of the bullet was almost parallel with the top of the bed. The daughter, Martha, testified that she heard her father and mother quarreling after she went to her room, and that about ten o'clock she heard her mother say: "Please do not shoot me Jim," or "Please do not shout," and heard a loud noise after that. She said her father told her to say her mother shot herself. The plaintiff in error did not testify during the trial but from a statement made before the coroner and offered in evidence by the People it appears he denied his guilt, and claims he did not know just what did happen because of the condition of his mind from drinking. When Martha came into the room the little four-year-old son was there also.

The plaintiff in error proved a good reputation as a peaceable and law-abiding citizen. The physician placed upon the stand by the People testified upon direct examination that when he came to the house Matter did not appear normal; his speech was incoherent, staccato, more abrupt than usual; he was excited and may have been affected by liquor. On cross-examination the physician said Matter was not normal at the time and was, therefore, insane, and that at the time of the trial he was different from what he

was on the night of the homicide and was sane. The doctor also admitted he was not an expert in mental diseases, although he had had some experience and had worked four or five months in a mental hospital before he graduated.

The most important testimony in the record is that of the ten-year-old daughter, Martha. After the police had come to the house, upon the doctor's call, she accompanied the police next door and was interrogated that night and several times during the next two or three days. She did not, at first, tell the story she told on the witness stand. She admitted that she was confused and frightened and was not very sure about things even then. On several important matters her testimony is at variance with the other witnesses. Martha says that she called Dr. McDougal. The doctor says that plaintiff in error called him. Martha says she put the gun in the closet and the doctor testifies he found it on the floor. Martha says that she took the lunch tray downstairs when her father wouldn't eat, and did not see any visitors come in about that hour. The witness, Peterson, says that he spoke to Martha when he came in and that he saw plaintiff in error eating the food on the tray when he went upstairs. There are other discrepancies between her testimony and the testimony of other witnesses that, considering her tender years, should be carefully scrutinized, in a case where the language said to have been used by the plaintiff in error is not only part of the proof of the homicide, but is used to characterize it.

There is nothing in the evidence to indicate any motive for murder other than the fact there was a quarrel between the husband and wife on the day and evening of the homicide. Plaintiff in error claims the evidence does not show beyond a reasonable doubt that he killed his wife; that the court erred in refusing to submit a form of verdict to the jury, authorizing them to find the defendant insane at the time of the homicide and sane at the time of the trial, and

erred in the giving of certain instructions on behalf of the People and refusing certain instructions offered by the defendant.

Plaintiff in error requested the court to give an instruction on the form of the verdict as follows: "We, the jury, find that the defendant, James K. Matter, committed the acts charged in the indictment, but at the time of committing said acts the said James K. Matter was insane, and we further find that the said James K. Matter has recovered from said insanity." The court refused to give this instruction. The fifth instruction given on behalf of the People, and the fourteenth and fifteenth instructions given on behalf of the plaintiff in error, all referred to the question of insanity presented by the evidence.

The statute, (Ill. Rev. Stat. 1937, chap. 38, par. 592,) provides, in part, that "if, upon the trial of a person charged with crime, it shall appear from the evidence that the act was committed as charged, but that, at the time of committing the same, the person so charged was insane, the jury shall so find by their verdict, and by their verdict shall further find whether such person has or has not entirely and permanently recovered from such insanity. * * * But in case the jury shall find by their verdict such person has entirely and permanently recovered from such insanity, he shall be discharged from custody," etc.

There was evidence in the record from which the jury might have found plaintiff in error was insane at the time of the alleged crime. There is also evidence that he was sane at the time of the trial. It is urged that this evidence was not of a substantial character and came from the People's witness, and that he was not an expert on insanity. When there is evidence in the record, not only the defendant, but the People, are entitled to have the jury instructed as to the law applicable to any state of facts shown by the evidence. (*People* v. *Strause*, 290 Ill. 259; *People* v. *Scalisi*, 324 id. 131; *People* v. *Priddy*, 327 id. 50; *Trask*

v. *People,* 104 id. 569.) The court apparently thought there was some evidence that justified instructions upon the question of insanity, as the plaintiff in error would have been presumed sane if there was no evidence at all in the record. Under the statute, above cited, the jury was entitled to have the form of the verdict offered by plaintiff in error submitted, and especially in view of the fact that all of the other possible forms of verdict in the homicide case were given by the court. We are not called upon to judge the weight of the evidence upon this question, as very slight evidence upon a given theory of a case will justify the giving of an instruction.

As bearing upon the question of whether the daughter accurately remembered all that took place, and the effect of her fright, confusion, and inconsistencies in her testimony, plaintiff in error offered the following instruction:

"No. 26. The court instructs the jury that they are not bound to believe anything to be a fact simply because a witness has stated it to be a fact, provided the jury believe from all the testimony that such witness is mistaken or has testified falsely; you will not indulge in a speculation or supposition concerning what any witness might have testified to; you will determine this case only according to the evidence before you and nothing else."

This instruction directed the jury's attention to the fact that it could disregard testimony if it believed that a witness was mistaken. This proposition is not covered by any other given instruction. The People claim the same matter was covered by instructions Nos. 9 and 13 but No. 9 refers to wilfully false statements and No. 13 cautions the jury not to allow its verdict to be affected by sympathy or by prejudice. We think this instruction should have been given as the jury undoubtedly would have a right to disregard testimony of any witness who was mistaken, as well as that of a witness who had committed perjury. The child's indecision as to whether her mother said "shout" or "shoot,"

as well as her inability to remember accurately many of the transactions appearing, made it highly important to have the jury properly instructed as to its rights and duties in weighing the credibility of the evidence.

There is no admission of the plaintiff in error, either to the police, coroner or the doctor, that he killed his wife. There are facts in the record that are consistent with innocence. The parallel course of the bullet has been explained by the People by saying that there must have been another shot fired. There is no evidence of such fact nor is there anything in the record to show, by bloodstains, where the body of the deceased was at the moment the bullet struck her. Because of the uncertainty created by all the testimony it was necessary that the jury be fully and accurately instructed, to enable it to arrive at a proper verdict.

*People* v. *Holtz*, 294 Ill. 143, presents a case where there was the unexplained killing of a husband while his wife and sister-in-law were present and where it was contended that one or both must have committed the crime, because it could not be shown that someone else had committed it. In reversing the judgment the court held that proof of mere presence and an opportunity to commit the crime charged, is not sufficient to justify conviction even though the defendants are unable to show who did commit it, but that the burden still rests upon the prosecution to show, beyond a reasonable doubt, that the crime was actually committed by the defendants and not by some other person. In the *Holtz case* statements of the defendants were used as a part of the proof, and in commenting thereon the court said, at page 167: ."The recollection of the words used is very easily influenced by the nature of the events as they are afterwards ascertained, and implicit reliance cannot be placed upon the verbal accuracy of witnesses who give an account of the words used or the statements made under the circumstances then existing."

We think the instruction advising the jury of the effect of a witness being mistaken was not covered by the instruction referring to the effect of wilfully false testimony, and under the state of facts disclosed by this record such instruction should have been given.

For the errors above indicated the judgment of the criminal court of Cook county is reversed and the cause is remanded for a new trial.

*Reversed and remanded.*