2 Ill. App.3d 513 (1971)
276 N.E.2d 427
THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee,
v.
JEWELL RICHARD SMOTHERS, Defendant-Appellant.
No. 11145.
Illinois Appellate Court  Fourth District.
November 23, 1971.
*514 Harlan Heller and Kenneth J. Meyers, both of Mattoon, for appellant.
Basil G. Greanias, State's Attorney, of Decatur, for the People.
Judgment affirmed.
Mr. JUSTICE TRAPP delivered the opinion of the court:
A jury found defendant guilty of murder and a sentence of 100 to 150 years was imposed. He appeals.
We note immediately that counsel for defendant accepted appointment on appeal willingly and with grace under conditions that were not within their normal professional obligation and that this appeal has been pressed with great vigor and careful diligence.
*515 It is urged that the conviction must be reversed and the cause remanded for a new trial because, (1) the court refused to give proper instructions presenting the issue of defendant's sanity at the time of the offense to the jury; (2) of improper and prejudicial argument by the prosecution, and (3) prejudicial cross-examination by the State directed toward degrading and humiliating the defendant before the jury.
The event occurred in the early morning hours of July 21, 1968, at a Decatur hospital. Defendant had been admitted as a patient several days before for the treatment of an ulcer. In addition to medication directed towards the ulcer, drugs were prescribed for pain and as sedatives and tranquillizers. Defendant was described by his attending physician as uncooperative, mentally agitated and suffering from an anxiety neurosis. The physician did not testify to any mental defects or mental illness.
At the time concerned the victim, Arnett, and his wife, together with the latter's sister and husband, were at the hospital where the wife's father was critically ill and under intensive care. A portion of the time this group waited in a "sun room" area of the hospital. Defendant had left his hospital room and was also present in this area, attired in a hospital gown. He was reading in the sun room area or walking up and down in an adjacent corridor, during which time he was described as smoking and as waving or swinging his arms. There was such random conversation as defendant asking the victim for a cigarette and later when the family group decided to go out for food, defendant asked them to bring him some beer. They refused. Upon their return defendant was still present. The victim's wife, sister and brother-in-law, went into another lounge area. Arnett had laid down upon a couch in the sun room to sleep or dose. Defendant was still present in the room. Within a short time nurses at a nearby station heard breaking glass and defendant was discovered at a window in the sun room holding a lighted newspaper toward the curtains. A substantial fire ensued in the hospital, and thereafter the body of the victim was found with his head crushed. A broken metal smoking stand was considered to be the lethal instrument.
Several nurses testified that as they came up with fire extinguishers, defendant held the glass doors of the sun room and they understood defendant to say that he would kill them with the smoking stand which he held if they came in. Ultimately, defendant walked away from this scene and was discovered at a rear service door of the hospital. At that time his hospital gown was described as sweaty and with blood stains on the back. He was later taken into custody and charged with this offense.
In opening statement to the jury, defendant's counsel stated that the *516 evidence would show that the crime of murder was not committed but that "The defendant, Mr. Smothers, further intends to prove that what action he took was justified * * *."
Defendant testified in his own behalf. In substance, he had left his hospital room because of an annoyance caused by other patients occupying the room  one was in great pain and restless, and another, a negro, had been brought in in a strait-jacket and was calling people on the telephone and cussing. He had gone to the sun room and was reading or walking around.
He testified in substance that after the victim's party returned to the sun room and the victim had laid down on the couch, within a short time the latter told the defendant to sit down and then, "(A)nd he had set a paper afire and raised up and threw it at me and told me, `I told you to sit down',"; that the victim pulled a knife from his pocket and "Opened the knife and came at me".
"I said, `Fellow, what's the matter with you?' He did not answer. I turned to my left and picked up an ashtray. He came closer to me. I swung it at him and I hit his hand promptly in the middle of his arm and he dropped the knife. He reached down to pick it up. I hit him again with the ash tray, the side of the head and I also hit him again side of the head. The ash tray flew out of my hand. He fell against me. I pushed him away. He turned around and fell against my back. I pushed him away again. He walked to the back of the couch where he had been sitting. He stood there for a few seconds. He walked on up, started staggering, fell in the phone booth head first, turned around and walked about the middle of the room, he fell. He got up on one left knee  he got up on his left knee as far as he could get, he fell over on his side and rolled over on his back. I picked the ash tray up that fell out of my hand, two nurses was standing at the door."
Defendant offered into evidence a pocket knife described as found in the following December in the dump ground to which the debris from the hospital fire had been removed. The evidence is that when found, the blade was open. The record shows that the search of debris extended over thirteen hours before the knife was found. Defendant also cross-examined the widow of the victim concerning the description of the latter's knife, which she testified could not be found after the homicide.
Thus far the record substance of the defendant's case has been self-defense. In considering the issue arising from the refusal of the instruction upon "sanity", we note that the record discloses extensive pre-trial discovery directed toward obtaining the military records, the hospital and medical records of the defendant. Defendant's counsel procured an order for psychiatric examination. The record further shows that counsel *517 was furnished with reports of examinations by two psychiatrists, one of whom, Bauman, resided and practiced in a community removed from the excitement of the locale of the homicide. The psychiatrist, Uyeno, was called as a witness by the defendant. He reported that the defendant knew the difference between right and wrong, and was sane at the time of the offense. Uyeno's report included: that there was no thought disturbance; insight and judgment were not faulty and that defendant was well oriented but was a sociopathic personality, easily angered and with little ego control. Dr. Bauman's written report was that defendant was correctly oriented with average or above intelligence; that his psychological tests were normal with a slight but not significant tendency to hysteria. Bauman reported that defendant was not psychotic or schizophrenic, but found that defendant had some difficulty in maintaining emotional stability and that stress could cause anxiety and frustration. No pre-trial motion for competency hearing was filed.
Defendant urges that the issue of "sanity" was essentially presented in the State's case, and that such testimony makes the giving of the tendered instructions not only proper but mandatory. The instructions tendered and refused included defendant's Instruction No. 13 in the language of IPI, Criminal, 7.02, 25.05 and 24.01.
We note the testimony pointed out by defendant. Doris Meals, a sister-in-law of the victim, testified that as her party left the sun room she asked a nurse at the nearby station, "If that patient should be in that room in there like that way he was". Her other testimony discloses, however, that she was referring to the fact that defendant wore only a hospital gown but that nothing that defendant did caused her to leave the sun room. There was no inquiry as to any opinion of "sanity" or criminal responsibility based upon her observation.
A technician, McCall, testified that she left the nursing station to investigate the fire, that defendant met her at the door of the sun room with the ash stand in his hand and told her not to come in. She testified that she reported this to the head nurse, Ford, at the station, who reportedly said, "I think he is mad." Such, of course, is an exclamation based on hearsay and does not reach the status of evidence. Nurse Ford testified but was not asked any opinion of "sanity". She testified that she had seen defendant earlier walking up and down the corridor and talking with people, but that he did not seem particularly nervous or agitated. Defendant called Nurse Warner who attended defendant on an earlier shift. She had observed defendant walking up and down flapping his hands and had reported that he had refused his medication. She stated further, however, that she did not consider such conduct a matter of concern.
*518 We note that defendant testified concerning the testimony of the several nurses that he had met at the door of the sun room with ash stand in hand and had threatened them if they entered. His testimony was that he wished to keep them away from decedent who had nearly killed him and that they misunderstood him, the defendant said.
Defendant points out the testimony of Police Officers Lycan, Butts, Behrens and Owens, who were with the defendant at the rear door of the hospital, or later. Elements of confusion and ambiguity appear and counsel did not present the testimony in the best and clearest form. A wing or portion of the hospital was known as Millikin, whereas the fire took place in a portion of a wing known as Latham. Defendant occupied a room in Millikin. A Millikin University is also situated in the city. Officers Butts and Behrens, without being required to state the language or substance of the language of defendant, answered "yes" to a question whether defendant thought he was at Millikin University. Officer Owens, undertook to substantially quote defendant as saying, "I didn't set the fire at the Millikin, but I did at the hospital". These officers also testified that defendant talked about people with guns at the hospital who were shooting at people, and that he saw negroes from the window who were going to shoot him.
Such remarks of the defendant may be viewed in the light of the testimony of Dr. Uyeno called by the defendant. On cross-examination he testified that at his first interview with the defendant, the latter's conduct was bizzare, that he was naked and rocking on his heels and talking about women with rifles and negroes who were going to shoot him. Uyeno testified that at his subsequent interview defendant told him that such account was a fabrication and that he, the defendant, needed an elaborate story.
Uyeno testified that the sociopathic personality, which he diagnosed, was a mental disease, but that defendant was not psychotic and that he knew what he was doing, and that he could conform his conduct to law.
Defendant points to the colloquy of the instruction conference and suggests that the court's reason for refusal to the instruction was error. The court did refer to "insanity" as an affirmative defense that had not been raised by the defendant during his opening statement or in his evidence, and that the State would have no opportunity to offer rebuttal. The court also, however, said that there was no evidence to raise an issue of fact for the jury. Upon his ruling on the post-trial motion, the court stated that there was no evidence to raise the issue of fact concerning sanity and that all of the evidence, including defendant's extended and detailed testimony, showed his competent responsibility.
 1 We believe that the trial court placed incorrect emphasis upon *519 "insanity", Ill. Rev. Stat. 1969, ch. 38, par. 6-2(a), as an affirmative defense requiring that defendant introduce evidence to establish the defense. Ill. Rev. Stat. 1969, ch. 38, par. 3-2(a) is in the language:
"`Affirmative defense' means that unless the State's evidence raises the issue involving the alleged defense, the defendant, to raise the issue, must present some evidence theron."
 2 Where the asserted defense is "insanity", the rule is stated generally that all men are presumed sane and that such presumption continues unless there is some evidence contending to prove insanity which is sufficient to raise a reasonable doubt of such sanity at the time the act was committed. (People v. Patlak (1960), 363 Ill. 40, 1 N.E.2d 228.) The statement of such principle continues under the present statute.
The bare-bones problem to be resolved is whether evidence of a quantum or quality here found raises an issue for the jury. Examination of many cases discloses that the issue of sanity was sufficiently raised by (1) an adjudication of insanity if evidence shows that such insanity continues (People v. DePompeis, 410 Ill. 587, 102 N.E.2d 813); (2) medical opinion of an attending doctor (People v. Matter, 371 Ill. 333, 20 N.E.2d 600); (3) the opinion of a psychiatrist (People v. Skeoch, 408 Ill. 276, 96 N.E.2d 473), and (4) the opinion of lay persons who have had an opportunity to observe the accused who state an opinion based upon the facts observed. People v. Patlak, 363 Ill. 40, 1 N.E.2d 228. See also People v. Bedford, 31 Ill.2d 227, 201 N.E.2d 420.
Examination of many cases in our courts has failed to disclose any authority which suggests that the issue of "sanity" is properly raised before the jury solely from testimony of witnesses describing the appearance, conduct or words of the accused. Defendant suggests that he relies particularly upon People v. Matter, 371 Ill. 333, 20 N.E.2d 600, but in that case the issue was raised by the stated opinion of the medical doctor treating the accused. Defendant has suggested no authorities in which evidence of the kind in this case was sufficient to raise the issue.
 3 On the contrary, a number of cases suggest that evidence of the quality before us is not sufficient to raise a reasonable doubt of sanity. In Montag v. People, 141 Ill. 75, it was held that testimony of witnesses to the effect that defendant was in trouble with his family and appeared disturbed in mind and seemed excited was not sufficient to raise a reasonable doubt of sanity. In People v. McBride (1970), (Ill. App.2d), 264 N.E.2d 446, witnesses' testimony of irrational conduct of the defendant during a part of the offense was not sufficient to raise a reasonable doubt of sanity. The same conclusion was reached where a witness stated that the defendant acted "crazy". (People v. Davenport, 111 Ill. App.2d 197, 249 N.E.2d 328.) In People v. Carter, 84 Ill. App.2d 135, 228 *520 N.E.2d 522, a conclusion of the witness that something was wrong with the defendant was ambiguous and insubstantial evidence which failed to meet the minimal requirements of the statute.
Defendant relies upon People v. Haun, 71 Ill. App.2d 262, 217 N.E.2d 470. There the defendant appeared pro se and the record showed that he had spent a substantial period of time in a mental institution and the court excluded the remarks of a lay witness based upon observations of defendant's nervous and mental state immediately prior to his acts. The issue there was the admissibility of evidence of mental state, rather than an issue of sufficiency of evidence to create the issue of "sanity".
 4, 5 Upon the proposition contended for, the evidence in this case is, at best, speculative and ambiguous. The full testimony of Mrs. Meals and Nurse Warner shows that they suggest no question of defendant's sanity. Statements of the defendant immediately after the event as recounted by the police officers are particularly insubstantial in the light of the testimony of Dr. Uyeno, and defendant admitted that he was creating an elaborate story concerning the events. No lay witness was asked to express any opinion concerning defendant's competency upon the events observed by such witness.
Dr. Uyeno made a diagnosis of a sociopathic personality. It has been held that personality disorders are not a mental disease within the meaning of the statute concerned. (People v. Williams, 38 Ill.2d 115, 230 N.E.2d 224; People v. Miller, 33 Ill.2d 439, 211 N.E.2d 708.) No testimony of Dr. Mulrooney suggests that the sedative tranquillizers or pain relieving medication prescribed affected the criminal responsibility of the defendant. Upon this record we may not say that the court erred in refusing the tendered instruction.
The defendant strongly urges that the language of the State's Attorney in cross-examination and in final argument was prejudicial and requires reversal. We have examined the record and authorities thoughtfully upon these issues.
 6 During cross-examination, the State's Attorney referred to a tic then apparent on one side of defendant's face as he testified. A question was asked if such was caused by a physical condition. Defendant's counsel objected, but the court ruled that the defendant had already answered. Defendant stated that to his knowledge, no physical condition caused the spasm. During the argument this condition was referred to as being evidence of the demeanor of the defendant to be considered by the jury. No objection was made to the argument. While the fact would be apparent to the jury, the record does not make clear whether the condition was usually and regularly apparent. An inference that it was not may be reached upon the record, and such inference is supported to some extent *521 by the report of Dr. Uyeno that such a tic appeared while defendant was taking psychological tests. Defendant relies upon Berger v. United States, 295 U.S. 78, 79 L.Ed 1314; People v. Gordon, 344 Ill. 422, 176 N.E. 722, and People v. Brown, 254 Ill. 260, 98 N.E. 535. In these cases the prosecutor misstated facts which were the basis of his cross-examination, or argued upon matters outside the evidence, or went into subjects foreign to the issues of the case. Here, what is said to be merely insulting and humiliating is also relevant to the demeanor of the defendant as a witness, and a proper matter for the consideration of the jury under the instructions of the court.
 7, 8 Further prejudice is urged from prosecution's argument concerning defendant as a sociopathic personality. In argument this was termed the equivalent of one who was a hater of people. The diagnosis of a sociopathic personality is in the record from the testimony of the psychiatrist called by the defendant. It is noted that the State's argument followed that of the defendant in which it was argued that a sociopathic personality was a form of mental disease. A sociopath is defined as one whose antisocial behavior is undertaken with an awareness of reality and understanding of the significance of his acts. (People v. Noble, 42 Ill.2d 425, 248 N.E.2d 96.) While there is no objection in the record, it is urged that the argument is plain error under People v. Moore, 9 Ill.2d 224, 137 N.E.2d 246. In that case the prosecutor's argument was that the defendant had been a gunman for many years  a fact which was clearly not within the evidence before the jury, and hence plain error. Moore points out, however, that argument based upon facts within the evidence or legitimate inferences from such facts are proper argument, and that it is proper to reflect unfavorably on the accused or to denounce a witness and he may urge fearless administration of the law. See also People v. Phillips, 126 Ill. App.2d 179, 261 N.E.2d 469; People v. Tyson (Ill. App.2d), 264 N.E.2d 403.
 9 It is urged that the prosecutor injected personal opinion into this argument. From the record, he commented that he was unable to understand the asserted contradictions in the defendant's theories of the case as shown by the evidence. We find, however, nothing to suggest that he went beyond the facts in evidence before the jury.
Judgment affirmed.
SMITH, P.J., concurs.
Mr. JUSTICE CRAVEN dissenting:
The argument of the assistant state's attorney in this case comes squarely within the rule announced by Mr. Justice Davis for a unanimous *522 Supreme Court in the case of People v. Moore, 9 Ill.2d 224, 137 N.E.2d 246. The court there summarized the permissible limits of argument and stated the unquestioned rule that argument based upon the evidence or upon legitimate inferences therefrom do not transcend the bounds of debate. It is proper for a prosecuting attorney to reflect unfavorably on the accused, to denounce his wickedness, and even indulge in invective. In this case, as in the Moore case, I believe the argument went well beyond the evidence or any reasonable inference from it in characterizing the defendant as a "people hater", comparing him to a "mad dog", discussing sanity or insanity when the jury was not instructed thereon by reason of prosecution's objection, and in supplying a subjective definition of sociopathic personality unwarranted by the evidence.
Argument to the jury exhorting the jury to vigorous enforcement of the criminal law may be permissible, but it is not permissible to state to the jury that the phrase "reasonable doubt" is something to confuse them.
As I view it, the argument was prejudicial, inflammatory, and of such a nature so that it cannot be said that the defendant had a fair trial. Thus, notwithstanding the absence of an objection by defense counsel, this case, as in Moore, should be remanded for a new trial. The trial court of its own motion should have stopped the argument and directed the jury not to consider it. In considering this issue the following portions of the argument by the assistant state's attorney are the most objectionable and are such as necessitate application of the rule found in the Moore case:
"* * * Mr. Uhl, Mr. Greanias, and ladies and gentlemen of the jury. I guess if we had to put a title to this case, ladies and gentlemen, we would call it the case of the socio-pathic (sic) killer, or death by a people hater. Now by dictionary definition, a socio-path (sic) is a person who hates or has a strong dislike for society, the people in it. And Doctor Remedios took the stand  not Remedios, beg your pardon  Dr. Uyeno and told you that this defendant was a socio-pathic (sic) personality. He hates people and society. In his report he stated they are able to keep out of trouble.
"* * * And Mr. Uhl said, what was his motive, although the State doesn't have to prove it. Why did he do this? I just told you why, ladies and gentlemen of the jury, he is a socio-path (sic), he hates people, society; the slightest thing will trigger him to attack members of society which he hates so strongly. That is his motive.
"* * * The defendant has a motive, or not a motive but a reason, and that is the fact that he is a socio-pathic (sic) individual. He is a dangerous and menace to you and you and every member of society.
"* * * I trust that in this day and age in which we find so much *523 apathy and disinterest where people watch crimes and do not come to the assistance of others, and where juries refuse to convict because they are given touch-stone phrase such as `reasonable doubt,' these are things to confuse you  where you can hang a not guilty and go home without fear that you have punished somebody. But justice is a two-edge sword. You must convict where there is guilt just as quickly and surely as you must acquit where there is innocence. In this case there should be no doubt in your mind.
"* * * Only a psychiatrist can give you an accurate definition of socio-pathic (sic) personality, but I think we have given you a lay one, and I think this will answer any inquiry his defense lawyer made about why he would he (sic) do it  because he is a socio-pathic (sic) personality and he is a people hater. This defendant, ladies and gentlemen, is guilty of the crime of murder. The evidence that you have heard, certain things have been received as physical evidence, his Honor will give you the law, I charge you to perform your sworn duty as representatives of the people of the State of Illinois, as the implementer of this desire for law and order, when you encounter an individual like this in the courtroom, although a difficult task indeed, I say to you this, consider having taken one's life, having been defined as socio-path (sic), if you turn him loose today by a not-guilty, where will he strike next, whom will he strike next? Can you say to yourself, he will not strike me because he is a socio-path (sic)."
Dr. Frank I. Uyeno in his testimony did describe the defendant as a sociopathic personality with chronic alcoholism and he described such to be a classified mental disease but relates to one who is usually able to determine right from wrong. Upon redirect examination by counsel for the defendant, Dr. Uyeno in discussing a sociopathic personality, again referred to a mental disease and that persons thus classified at times do come in conflict with the law.
Characterization of the defendant as one who hates people and society, who is mentally hysterical, a dangerous menace to the jury, and one with continuing criminal propensities constitutes a non-evidentiary and gratuitous definition of sociopath.
Finally, I am unable to agree with my colleagues that the issue of insanity and the tendered instructions were properly refused. This becomes more difficult to understand in view of the statement in the majority opinion that the trial court placed an incorrect emphasis on insanity as an affirmative defense requiring that the defendant introduce evidence to establish the defense. Opinion evidence of insanity, lay or professional, is admissible and no reason is suggested that such evidence has to be couched in conclusionary language. The evidence in this case as to the *524 bizarre conduct of the defendant prior to, at the time of, and after the offense was sufficient to submit the issue to the jury. (People v. Haun, 71 Ill. App.2d 262, 217 N.E.2d 470, and cases there cited.) This record appears to be the converse of the situation found in the cited case of People v. Carter, 84 Ill. App.2d 135, 228 N.E.2d 522, where a witness stated a bare conclusion and such conclusion was held not to meet the minimal requirements of the statute.