THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* LOUIS POTE, Defendant-Appellant.

(No. 59390; ▮▮▮▮▮▮▮▮▮▮)

First District (5th Division)—February 14, 1975.

*Rehearing denied April 23, 1975.*

Reiff and Whalen, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Patrick T. Driscoll, Jr., and William F. Linkul, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE BARRETT delivered the opinion of the court:

Defendant was charged with the murder of Harold Davis (Ill. Rev. Stat. 1967, ch. 38, par. 9—1), and was found guilty by a jury of involuntary manslaughter (Ill. Rev. Stat. 1971, ch. 38, par. 9—3).

On appeal defendant contends that (1) he was denied due process of law by the giving of instructions to the jury on the charges of voluntary manslaughter and involuntary manslaughter, and (2) the evidence at trial did not establish the elements of involuntary manslaughter.

At trial, the State called over 20 witnesses. Although their testimony differed in certain details, the witnesses testified to some or all of the following.

Some time around midnight on October 15, 1968, two black males perpetrated the armed robbery of a neighborhood tavern. As the robbers started out the door, Art Pauly, one of the patrons, struggled with them and was shot in the neck. The tavern owner and a patron or two pursued the robbers but were unable to capture them, even with the assistance of a police patrol car that had stopped to assist. When they returned to the tavern, the area surrounding it was crowded with police and civilians. While they were away, the bartender had called the police, who took him for a 10- to 20-minute search of the area that proved fruitless.

Shortly after midnight on the day in question, Richard Owens, Ronald Owens, and Harold Davis were talking on a street-corner. Defendant's car approached them and stopped. Defendant, a Chicago police officer who was not assigned to a shift at that hour, exited with a gun and told the three to get up against a nearby wall, where they were searched. Robert Walker and Richard Owens' brother, Gregory, approached the scene and were ordered to stand against the wall with the others. Defendant then directed the five black males into his car. He drove them to the tavern while Art Pauly, who had accompanied defendant, held a gun on them.

When they arrived at the tavern there were many people in the area, including several uniformed police officers, as well as several marked police cars. Defendant stated that he had the robbers. He went into the tavern and returned with the bartender and perhaps a few patrons. Defendant ordered the five men out of his car and asked whether they were the ones who were involved in the robbery. The bartender said

that they were not the ones. No one else gave a positive identification.

According to the testimony of Richard Owens, defendant then came over to him, asked him if he could run, told him to run to an alley, and hit him in the stomach with a gun when he refused. Defendant then, in turn, spoke to Ronald Owens and Robert Walker, and each shook his head and ran west toward an alley. As each ran, defendant fired his gun at him. Then defendant spoke to Harold Davis, who also shook his head and started running. Davis was shot by defendant as he ran.

The wounds to Davis' back caused by this shot were determined to be the cause of his death.

Robert Walker and Ronald Owens recalled the events surrounding the shooting of Harold Davis in a manner similar to Richard Owens. Officer Gary Smith's testimony was also similar, but Officer Smith testified that no shot was fired after the second person ran.

According to Gregory Owens, defendant demanded that his brother, Richard, run. Defendant hit Richard in the stomach when he refused. Defendant then asked Robert Walker to run, and Walker did so. Defendant shot at Walker with his arm "elevated upwards." He then told Ronald Owens to run. A uniformed police officer observed that Ronald Owens was a cripple, and defendant did not fire at him.

Officer Raymond Hutton testified that he told the five men to leave the scene. Thereafter, defendant told Ronald Owens to run. As Owens did so, defendant drew his revolver and fired a shot that hit a building. Hutton put his hand on defendant's arm and attempted to push it down, saying, "you shouldn't fire a gun at anybody right now, not right now." Hutton's partner, Officer David Kelley, corroborated Hutton's testimony in this regard, and Richard Owens testified that Hutton made this statement before, not after, the first shot was fired. According to Hutton, defendant then had another of the five run. After that, defendant told Harold Davis to run. Hutton heard a shot and turned around to see defendant with his .38-caliber snub-nosed revolver in a raised position. Davis had been shot.

Hutton, who had known defendant for 2 years prior to the occurrence, also testified that in his opinion defendant was under the influence of alcohol at the time of the shooting. Several other witnesses indicated that they found no indication of this.

In Hutton's opinion, judging from the fact that defendant's arm was extended at an angle, defendant fired a "warning shot" at Ronald Owens. But Hutton did not hear defendant call to any of those who ran to stop, nor was Hutton able to suggest what warning defendant was attempting to convey. At the time of the shootings, no one was close to defendant,

no one other than defendant had a weapon drawn, and none of the five men had attempted to escape.

Officer Smith testified that a warning shot is fired when a policeman believes a felony has been committed. He was unable to form an opinion as to whether defendant had fired a warning shot, although he testified that when defendant fired the first shot, his gun was pointed in the air.

Officer Benjamin Ochoa testified that when defendant fired the first shot, his arm was raised to approximately a 45-degree angle. His partner, Officer James Kostecki, corroborated this testimony. According to Officer Ochoa, defendant's arm was at a lower angle when he fired the fatal shot.

Brenda McMorris, who lived across the street from the tavern but who witnessed the occurrences from the street, testified that when defendant shot at the first individual (Ronald Owens) who went across the street after being pushed by defendant, defendant's arm was at an angle higher than the man, or at a 45-degree angle. As to Harold Davis, the angle of the defendant's arm was raised from level, but lower than it was when the first shot was fired.

Lieutenant Thomas Sullivan of the Chicago Police Department testified that when he arrived at the tavern he asked defendant what had happened. Defendant told him that the fellow lying on the ground was one of the persons who had robbed the tavern. Defendant said he had shot the person as he was fleeing. In a conversation later that day, defendant told Lieutenant Sullivan that as he entered the tavern he saw people fighting. Three men rushed out and knocked him to the ground. As he fell, defendant saw one man fleeing west on 65th Street and the other two fleeing south on Ashland Avenue. He drew his revolver and fired one shot that caused the fellow fleeing on 65th Street to fall. He then fired a shot at the two who were fleeing on Ashland Avenue. One on the men stumbled, fell, regained his feet, and continued running. The third person ran across the street to the east side of Ashland Avenue. Defendant said he did not fire at him because he did not have a clear shot.

Defendant later told essentially the same story to Captain Marschall, who testified at the trial.

Defendant presented no evidence on his own behalf.

OPINION

■■ If the evidence in a murder prosecution will support a verdict of manslaughter, a defendant will not be heard to complain that a manslaughter instruction was given, even though he did not request it. Only

where the evidence establishes that a defendant is guilty of murder or is not guilty does the defendant have a right not to have the jury charged as to lesser included offenses. (*People v. Taylor*, 36 Ill.2d 483, 224 N.E.2d 266.) In the instant case, instructions on both voluntary and involuntary manslaughter were proper, because there is evidence which, if believed by the jury, would support a guilty verdict on either charge.

We agree with defendant's contention that there was no evidence that he committed voluntary manslaughter by killing when "under a sudden and intense passion resulting from serious provocation." (Ill. Rev. Stat. 1973, ch. 38, par. 9—2(a).) Defense counsel was informed at the conference on instructions that the State was seeking to obtain a conviction on the basis of section 9—2(b) of the Criminal Code, which is a form of voluntary manslaughter that is separate and distinct from the "passion killings" described in section 9—2(a). The jury was instructed accordingly—*i.e.*, that "[a] person commits the crime of voluntary manslaughter who intentionally or knowingly kills another if, at the time of the killing, he believes that circumstances exist which would justify the killing, but his belief that such circumstances exist is unreasonable." (IPI—Criminal § 7.05.) There was testimony that defendant stated that he shot Harold Davis as the latter was attempting to escape from a robbery he had just committed. From this testimony, the jury could have concluded that defendant shot Davis intentionally or knowingly but that he acted on the basis of an unreasonable belief that the killing was justified in order to prevent the victim from escaping arrest for a forcible felony. Ill. Rev. Stat. 1973, ch. 38, par. 7—5.

■■ Similarly, there was adequate evidence to support the giving of an instruction and a guilty verdict on involuntary manslaughter. By firing his gun in the direction of Harold Davis, who was in motion, defendant may well be found to have performed an act likely to cause death or great bodily harm. This behavior and the circumstances under which it occurred—including the presence of a crowd of civilians and policemen, the fact that defendant had fired his gun previously, and the warning by his fellow officer not to continue shooting—support a finding that defendant consciously disregarded a substantial and unjustifiable risk that someone would be seriously injured or killed. The disregard of this risk is a gross deviation from the standard care which a reasonable person would exercise in the situation.

We disagree with defendant's contention that he was denied due process and was unable to meet the charges against him because no mention of manslaughter was made until the conference on instructions.

When the manslaughter instructions were tendered at the conference, defense counsel objected to them on the ground that the State was attempting to obtain a compromise verdict on a crime not supported by the evidence. As shown above, the record contains evidence that would support a guilty verdict on either voluntary or involuntary manslaughter. In view of the conflicting evidence and differing accounts of the occurrence, we think the giving of instructions relating to all three crimes was not an attempt to insure a compromise verdict.

■■ The conference on instructions was continued to the next day. At that time defense counsel indicated, for the first time, that he was "taken by surprise in connection with the State repeatedly during the voir dire examination making no mention of manslaughter but telling the prospective jurors * * * that the court would define murder." But defense counsel must be deemed to have been aware from the outset that lesser offenses are included in the charge of murder and that a jury may properly return a guilty verdict on a lesser included offense when the verdict is supported by the evidence. Furthermore, defense counsel never asserted in the trial court that he had been precluded from presenting a defense to the manslaughter charges. Nor did he request additional time for preparation of a defense. Rather his express concern was in learning the State's position in order to prepare for closing argument. In short, defense counsel's behavior, both at the conference on instructions and during the entire trial, indicates that the absence of references to manslaughter charges until the conference on instructions did not limit him or impede his performance. Defendant was not denied due process.

For the foregoing reasons, defendant's conviction is affirmed.

Affirmed.

DRUCKER and SULLIVAN, JJ., concur.