THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* PAUL DeWIT, Defendant-Appellant.

First District (1st Division)    No. 81—3019

Opinion filed March 30, 1984.—Rehearing denied May 29, 1984.

724

Louis B. Garippo, of Chicago (Susan G. Feibus, Thomas A. Moore, Lorna Propes, and Edward H. Mogul, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat and Kevin Sweeney, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CAMPBELL delivered the opinion of the court:

Defendant, Paul DeWit, following a jury trial, was found guilty but mentally ill on the charge of murder. He was sentenced to 22 years in the Illinois Department of Corrections. On appeal, defendant raises the following issues: (1) whether the statute permitting a jury to find a defendant who has raised the insanity defense to be guilty but mentally ill (Ill. Rev. Stat. 1981, ch. 38, par. 115—4(j)) is unconstitutional on its face and as applied to defendant; (2) whether the defendant was denied a fair trial by repeated instances of prosecutorial misconduct; and (3) whether the prosecution and the court improperly withheld discovery material from the defense in violation of Supreme Court Rule 412. 87 Ill. 2d R. 412.

Defendant was charged by indictment with the stabbing death of Everett Clark on September 9, 1980. The victim, a 68-year-old drama coach, was found stabbed to death in his studio at the Fine Arts Building, 410 South Michigan Avenue, Chicago, Illinois.

I

At trial, Ann Lang testified on behalf of the State that she was an artist and used a studio next door to Everett Clark's studio on the 10th floor of the 410 South Michigan building. On September 9, 1980, at approximately 2:15 p.m., Clark stopped by her studio to chat for a few minutes. Later, Lang heard Clark's voice cry out, "No, Paul, God, no, Paul." At the time Land did not think anything was wrong since she often heard Clark's voice during his drama lessons. Lang testified that at about 7:30 that evening, she received a telephone call

from Peter Orr, the man with whom Clark shared an apartment. Orr was concerned that Clark had not returned home yet. Lang got the elevator operator to open Clark's studio. The operator discovered Clark's body and Lang called the police.

Mayhen Rhodes testified that he is a violin restorer employed by a violin dealer located next door to Clark's studio. On September 9, 1980, when he was returning from lunch, Rhodes rode the elevator to the tenth floor with Clark. When the elevator doors opened, someone, whom Rhodes took to be a student of Clark's, approached the elevator and greeted Clark. At trial, Rhodes identified the defendant as the man who greeted Clark. Rhodes testified that he recognized defendant as one of Clark's students who would sit on a bench outside Clark's studio waiting for the drama lesson to begin. Rhodes walked down the hall behind Clark and defendant. As Rhodes reached the door of the violin shop, defendant asked Rhodes if he was Clark's student. Rhodes answered that he was not. A few minutes later, Rhodes was talking to a co-worker when the co-worker called his attention to someone moving across the window ledge outside the tenth floor. Rhodes saw that it was defendant. Rhodes watched defendant move eastward along the ledge until he came to a fire escape. Rhodes testified that the width of the ledge varied from seven to 18 inches.

Testimony by members of the Chicago police department indicated that defendant and several other of the victim's students with the name "Paul" were questioned in connection with the stabbing. Officer Murphy testified that he interviewed defendant in defendant's apartment on the afternoon following the murder. Defendant denied knowing Everett Clark. Murphy asked defendant if he would submit to a lineup. Defendant said he would cooperate but he had to attend a night school class that evening and would contact the officers when his class was over. Murphy testified that defendant appeared normal, understood their conversation and gave responsive answers to their questions. Murphy noticed nothing that would indicate that defendant was insane. The police set up surveillance in the lobby of defendant's building to see if defendant would leave for his night school class. Defendant did not leave the apartment until 8 a.m. the following morning, at which time he was arrested. Murphy also testified that at about 1 a.m. on September 10, Edward Mogul called the police station and said that he had been defendant's attorney in the past. Mogul said that he had heard news reports that someone named Paul had killed Everett Clark, that his client Paul DeWit had been a student of Clark's and that DeWit had been acting violently of late.

Detective Hood of the Chicago police department testified that he

interviewed defendant following defendant's arrest. Hood testified that after he told defendant his constitutional rights, defendant confessed to the murder. Defendant said that he had been a student of Clark's for about four months. Defendant told Hood that he went to Clark's studio on that day to kill Clark because Clark deserved to die. Defendant said that he got to Clark's studio at about 1 p.m. and waited for Clark to return. Clark told defendant that he could no longer help defendant in his career. Defendant pushed Clark to the floor and stabbed him with a scissors that defendant had brought from home. Defendant then fled along the window ledge to the fire escape. Defendant also told Hood that he was not insane.

Defendant's father, Cornelius DeWit, testified that his son was born in 1959. While in high school, his son was involved with drugs and had "quite a few brushes with the law." Defendant and his family went to several counselling sessions but the sessions were not helpful because defendant would not communicate with his family. After defendant graduated from high school, his father got him a job in an automobile plant as a production worker. Defendant worked there for six months, saved his money and then quit. Defendant moved to Chicago. He told his father that he was modeling and working as a waiter. Defendant continued to visit home weekly.

Mr. DeWit testified that throughout 1979 he thought that defendant had "straightened out," but in the early part of 1980 he noticed a drastic change. In his father's opinion, defendant's appearance changed from well dressed to unkempt and sloppy. Defendant had a very negative view toward life. Defendant's father described an incident in July 1980, when defendant attempted suicide by carbon monoxide poisoning in the garage of the family home. When he was revived, defendant told his father that nobody loved him, that he feared for his life and that the mafia had a contract out on his life. Defendant left a note which said that his brothers were beating up on him and his mother tried to kill him. Mr. DeWit arranged for defendant to see the family doctor who suggested that defendant see a psychiatrist. Mr. DeWit did not arrange for his son to see a psychiatrist. After that incident, defendant did not visit home again.

On August 10, 1980, the DeWits went to see their son at his apartment. He was not home so they went to the restaurant where he said he worked. No one at the restaurant had ever heard of defendant. They returned to his apartment building and found defendant. Mr. DeWit confronted defendant with his lie and asked defendant if he worked as a prostitute. Defendant admitted that he did. His parents asked defendant to come home but defendant said he could not

because he was going to California. A few days later, Mr. DeWit received a call from defendant. Defendant said that he was in California and that he could not find a job and all his friends were gone. Mr. DeWit characterized defendant as "completely hysterical." He was crying and said he had no money. Mr. DeWit sent him money.

Mr. DeWit next heard from his son on September 8, 1980. Defendant was calling from the police station. He said he was locked up for getting himself in a fight. When Mr. DeWit bailed his son out, defendant said that he had gotten in a fight because his manager owed him $750,000 under circumstances too difficult to explain.

Defendant's roommate, Allen Brown, age 42, testified in response to defense counsel's questions that he had run a call-boy ring and that defendant was one of the prostitutes who worked for Brown. Brown had met defendant in the health club where defendant worked out. Defendant lived with Brown from autumn 1978 to August 1980. Brown testified that when he first met defendant, defendant was a friendly, pleasant person. Around May 1980, however, Brown began to notice a change in defendant's personality. On several occasions, Brown found defendant crying. Defendant would tell Brown that various people were trying to kill him: his parents, the people at the gym, the mafia and Brown himself. In May 1980, Brown and defendant took a trip to New York. When they returned, defendant told Brown that producers were following him to get him to sign a contract for a movie but he did not want to sign.

Brown noticed that defendant was restless and unable to concentrate. Previously, defendant had shown concern for his appearance, but he began to "let himself go." Brown testified that in August 1980 he was unable to cope with defendant any longer so he told defendant to go to California. Defendant left for California in mid-August and three days later called Brown. He told Brown that he was at the top of a building and wanted to jump but did not have the nerve. He also said that he wanted to come back. Brown refused to let him. A few days later, defendant came to the apartment and told Brown that he was going to live there. When Brown threatened to call the police, defendant said he would kill Brown if he did. Defendant moved back into the apartment.

One night, Brown returned to the apartment and discovered that both he and defendant were locked out. Brown suggested that they sleep on a patio they had constructed on the fire escape outside their apartment. Defendant jumped off the fire escape and holding on to the railing, started swinging and broke through the window to their apartment. Brown testified that although he told the police at the

time that he thought defendant was intoxicated, he now believes that defendant was not intoxicated but was crazy. Shortly after that incident, Brown moved out.

Robert LaMonto testified that he met defendant in 1978, at which time it was apparent to him that defendant was a troubled person and that he "basically lacked direction." LaMonto tried to give defendant a little guidance. He took defendant to lunch and shopping several times. LaMonto found, however, that defendant wanted to "occupy a large amount of [his] time." LaMonto told defendant that they could not spend any more time together. Defendant told LaMonto that he was going to California for an acting job and that ended their friendship.

LaMonto testified that in May 1980 he again met defendant at the gym where LaMonto worked out. LaMonto told defendant that they could not socialize outside of the gym. LaMonto testified that as the summer wore on defendant became belligerent toward him and frequently called his apartment. On September 6, 1980, defendant went to LaMonto's apartment. When LaMonto's roommate, Brian Riley, told defendant that LaMonto was not home, defendant forced his way into the apartment and attacked Riley. At approximately 11 a.m. on September 8, 1981, defendant again came to LaMonto's apartment. LaMonto told him to leave, but defendant started coming through the door with a sledge hammer. LaMonto "rushed" him and forced defendant into the hallway of the apartment building. Defendant accused LaMonto, without basis, of cheating defendant out of $750,000. Defendant was very angry and appeared to believe his story. The police arrived and arrested defendant. Defendant told them that LaMonto had stolen money from him, was a mafia killer and tried to kill defendant. LaMonto testified that defendant told him that "nothing matters now. Next time, I'll be back with a gun."

Brian Riley, LaMonto's roommate, testified that when defendant came to the apartment on September 6, Riley told him that LaMonto was not home. Defendant then knocked Riley down and threw apartment furniture at him. Riley testified that defendant appeared highly excited and in a rage. When a neighbor came to the door, defendant fled. Riley testified that the apartment was "in a shambles."

Chicago police officer Michael O'Brien testified that he responded to a call concerning the fight between defendant and LaMonto on the morning of September 8, 1980. When O'Brien and his partner arrived on the scene they broke up the fight and restrained defendant. O'Brien testified that defendant appeared to be in a rage. Defendant eventually calmed down at which time his appearance and actions be-

came normal. Defendant told the officer that he was LaMonto's former roommate, that LaMonto had cost him hundreds of thousands of dollars and that he had come to reclaim his personal items.

Officer Karen Dollan testified that she spoke with defendant following his arrest for attacking LaMonto. Defendant asked Dollan general questions about procedure. He then told Dollan that "he had come to the decision that maybe he should kill someone." Dollan told defendant that murder is always wrong and defendant agreed. Dollan also stated that she did not believe that defendant was insane. She also testified that she spoke to LaMonto and LaMonto told her that he and defendant had been lovers once and defendant was now jealous of LaMonto's new lover.

Stanley Washington testified that he met defendant at a health club in November 1979. At that time defendant was friendly and non-violent. By the summer of 1980, however, Washington noticed that defendant was tense, withdrawn, moody, unsociable and had a blank stare.

Dr. James Lewis Cavanaugh, Jr., testified for the defense. He is a psychiatrist specializing in forensic psychiatry and is medical director of the Issac Ray Center. The Issac Ray Center is an out-patient clinic that deals primarily with the evaluation of criminal offenders to determine if they meet the standards of legal insanity and also provides treatment for those offenders found to suffer from a significant mental illness. Dr. Cavanaugh and his staff interviewed defendant's parents, Allen Brown, Brian Riley and Robert LaMonto. Based on these interviews, Dr. Cavanaugh concluded that beginning in September 1980 defendant was deeply disturbed and was operating on the basis of his delusional preoccupations. As a result, defendant had an increasing inability to use judgment or to appreciate what was real. Dr. Cavanaugh also interviewed defendant on three occasions and found significant defendant's continued preoccupation with his paranoid ideas and his lack of awareness of how false his ideas were.

Defendant was given a neurological examination and the results were normal, showing that defendant had no organic problems in his brain. Defendant was also given the Minnesota Multifacet Personality Inventory test which indicated that defendant was exaggerating some of his responses in an attempt to appear sicker than he actually was. Next, defendant underwent a psychodiagnostic test called the Schedule of Affective Disorders and Schizophrenia, which indicated that defendant demonstrated a schizophrenic illness of the paranoid type. The test showed that defendant had delusions of possessing the powers of telekinesis, thought broadcast and thought assertion.

Defendant was found to suffer from visual hallucinations. Dr. Cavanaugh testified that, in his expert opinion, defendant was unable to appreciate the criminality of his conduct and unable to conform his conduct to the requirements of the law.

Dr. Robert Reifman, a psychiatrist, testified that he reviewed a report on defendant from the Issac Ray Center and concluded that defendant was a paranoid schizophrenic suffering from delusions of persecutions and of grandiosity. In his expert opinion, defendant was suffering from a mental disease which caused him to lack the capacity to conform his conduct to the requirements of the law.

On rebuttal, Dr. Werner Tuteur, a psychiatrist, testified on behalf of the State. He testified that he examined the report from the Issac Ray Center as well as defendant's police report. He interviewed defendant on March 28 and April 4, 1981, and found defendant's mental state to be excellent. Defendant was cooperative and described fully the day he committed the murder, including the fact that when he arrived at the Fine Arts Building he went to the roof to investigate a possible escape route along the window ledge which he later used. Dr. Tuteur believed that defendant was "in touch with reality" and was not psychotic. When asked about many of the delusions and false beliefs witnesses had testified that defendant had, defendant denied them. Dr. Tuteur stated that if defendant was suffering from paranoid schizophrenia, his symptoms would have increased while in jail since he had not received any medical treatment. Dr. Tuteur testified that, in his expert opinion, defendant was not suffering from a mental disease on September 9, 1980, and that defendant could appreciate the criminality of his conduct and knew he was "doing something wrong."

Additionally, several lay witnesses testified for the State. Two assistant State's Attorneys who had taken defendant's statement after he was arrested both testified that defendant appeared sane at the time they interviewed him. Pero Hansen, a medical social worker at the Cook County Department of Corrections, testified that he interviewed defendant on February 6, 1981, and that, in his opinion, defendant was not psychotic at that time. Hansen also testified that a person could be schizophrenic and yet not be psychotic.

The trial court instructed the jury on the elements of the offense of murder which the State must prove beyond a reasonable doubt, including the proposition that defendant was sane at the time of the offense. (Illinois Pattern Jury Instructions (IPI), Criminal, Nos. 7.01, 7.02 (2d ed. 1981).) The judge also instructed the jury on the findings necessary to determine that defendant was not guilty by reason of in-

sanity. (IPI Criminal No. 24—25.01.) Then, over defendant's objection, the jury was instructed according to the guilty but mentally ill provisions of section 115—4(j) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1981, ch. 38, par. 115—4(j)). The court instructed the jury as follows:

> "A person is guilty but mentally ill if at the time of the commission of an offense he was not insane but was suffering from a mental illness.
>
> Mental illness means a substantial disorder of thought, mood, or behavior which affected a person at the time of the commission of the offense and which impaired that person's judgment, but not to the extent that he is unable to appreciate the wrongfulness of his behavior or is unable to conform his conduct to the requirements of law." (See Ill. Rev. Stat. 1981, ch. 38, pars. 6—2(d), 115—4(j).)

The jury found defendant guilty but mentally ill, and defendant was sentenced to 22 years' imprisonment.

## II

Defendant first contends that the guilty but mentally ill verdict authorized by section 115—4(j) (Ill. Rev. Stat. 1981, ch. 38, par. 115—4(j)) is unconstitutional as an *ex post facto* law when applied to him. (U.S. Const., art. I, sec. 9; Ill. Const. 1970, art. I, sec. 16.) Section 115—4(j) became effective on September 17, 1981, just over a year from the date defendant allegedly committed the murder and several days before defendant's trial began. Defendant argues that the section increases the penalty for his crime and disadvantages him because it diluted his statutory right to an insanity defense.

■ Defendant relies upon the test for determining an *ex post facto* law propounded in *Weaver v. Graham* (1981), 450 U.S. 24, 67 L. Ed. 2d 17, 101 S. Ct. 960. In order to violate the prohibition against an *ex post facto* law, the law in question must apply to events occurring before its enactment and it must disadvantage the offender affected by it. (*Weaver*.) The Supreme Court also stated that in determining the constitutionality of the challenged provision one must look to the provision's terms and not to any special circumstances which would mitigate its effects upon a particular individual.

Defendant argues that the two Illinois cases which have allowed the application of section 115—4(j) to offenders whose crimes were committed before the section's effective date relied upon an analysis of the *ex post facto* issue rejected in *Weaver*. (*People v. Dalby* (1983), 115 Ill. App. 3d 35, 450 N.E.2d 31; *People v. Marshall* (1983), 114 Ill.

App. 3d 217, 448 N.E.2d 969.) The *Weaver* court determined that a criminal or penal law need not impair a "vested right" to violate the *ex post facto* prohibition.

In *People v. Marshall*, the defendant argued that the application of section 115—4(j) to him violated the *ex post facto* prohibition. The court held that under the definition of *ex post facto* laws found in *Calder v. Bull* (1798), 3 U.S. (3 Dall.) 386, 390-91, 1 L. Ed. 648, 650, the application of section 115—4(j) to defendant was permissible since the section did not aggravate any offenses committed before its effective date. The court determined that the section merely altered the conditions of defendant's confinement but did not significantly alter the fundamental nature of the punishment. Such laws, the court concluded, are not *ex post facto* laws based upon *Malloy v. South Carolina* (1915), 237 U.S. 180, 59 L. Ed. 905, 35 S. Ct. 507. Although the court did employ the "vested rights" analysis, this analysis was in response to the argument that section 115—4(j) was improperly applied as a retroactive law (see *United States Steel Credit Union v. Knight* (1965), 32 Ill. 2d 138, 204 N.E.2d 4), but not in response to the charge that section 115—4(j) was unconstitutional as an *ex post facto* law. (*People v. Marshall* (1983), 114 Ill. App. 3d 217, 235-36, 448 N.E.2d 969, 981-82.) In *People v. Dalby*, the court concluded that section 115—2 (Ill. Rev. Stat. 1981, ch. 38, par. 115—2), which permits the plea of guilty but mentally ill, was not an *ex post facto* law when applied to a defendant who committed his offense prior to the effective date of the act since the section does not change an offender's responsibility for his criminal conduct if he is mentally ill yet not legally insane. *People v. Dalby* (1983), 115 Ill. App. 3d 35, 38, 450 N.E.2d 31, 33.

The State asserts that the statutory definition of insanity which would relieve an offender of criminal responsibility remained the same before and after the enactment of the legislation in question. The legislation's only effect, the State contends, is to divide guilty defendants into two classes one of which is recommended for psychiatric care.

■ After a review of the precedent and the arguments of counsel, we are not persuaded the defendant was "disadvantaged" within the meaning of *Weaver* by the application of section 115—4(j) to his offense. The burden on the State to prove beyond a reasonable doubt that a defendant who has raised the defense of insanity is not insane has remained the same both before and after the enactment of section 115—4(j). Furthermore, the longstanding definition of insanity under Illinois law recognizes that a person who is suffering from a mental illness which does not substantially impair his capacity to conform his

conduct to the requirements of the law, may be held criminally responsible for his actions. *People v. Gold* (1967), 38 Ill. 2d 510, 232 N.E.2d 702, *cert. denied* (1968), 392 U.S. 940, 20 L. Ed. 2d 1400, 88 S. Ct. 2317; *People v. Peters* (1975), 33 Ill. App. 3d 284, 294, 337 N.E.2d 716, 723.

The *Marshall* court stated that it found no precedent to support the argument that a statute which merely makes the assertion of certain defenses less desirable than they would have been at the time of the offense violated the *ex post facto* doctrine. Defendant was not deprived of the ability to assert the insanity defense and the defense itself remains unchanged. Moreover, the punishment for his offense was neither increased nor changed in such a way as to disadvantage him. We are not persuaded that the application of section 115—4(j) to defendant violated the *ex post facto* doctrine.

### III

Defendant next contends that section 115—4(j) both on its face and as applied to defendant violated his constitutional right to due process. With respect to his challenge that the section is unconstitutional on its face, defendant contends that the guilty but mentally ill verdict promotes jury confusion and encourages a finding of guilty but mentally ill as a compromise. Defendant argues that the distinction between legal insanity and mental illness is likely to be incomprehensible to the average juror since the definitions overlap and are poorly conceptualized. Consequently, the statute fails to provide adequate standards to enable the jury to reach a just verdict.

The State contends that juries have been making implicit findings of whether a defendant is legally insane or suffering from a mental illness of lesser severity since the insanity defense came into existence. Section 115—4(j) has the effect of making such findings explicit. The State further argues that the guilty but mentally ill verdict tends to reduce jury confusion rather than promote it since the instructions given to the jury under section 115—4(j) more accurately reflect and explain Illinois law. The State points out that the common usage of the term "insanity" differs from its precise legal meaning in section 6—2(a) (Ill. Rev. Stat. 1981, ch. 38, par. 6—2(a)). The comparison of the requirements between the verdicts of not guilty by reason of insanity and guilty but mentally ill clarifies the meaning of legal insanity and thereby aids the jury in reaching a decision.

It is well established that to survive a challenge of denial of due process a statute may not be so vague that men of common intelligence must necessarily guess at its meaning. (*People v. Garrison*

(1980), 82 Ill. 2d 444, 412 N.E.2d 483, *appeal dismissed* (1981), 450 U.S. 961, 67 L. Ed. 2d 610, 101 S. Ct. 1475.) A statute must also provide sufficiently definite standards for law enforcement officials and triers of fact so that its application does not depend merely on their private conceptions. (*Garrison.*) Section 115—4(j) expresses its requirements in simple and clear language (see *People v. Davis* (1966), 35 Ill. 2d 55, 219 N.E.2d 468). Furthermore, the definition of mental illness provides meaningful standards for a jury to make the required findings. *People v. Pembrock* (1976), 62 Ill. 2d 317, 342 N.E.2d 28.

■ Defendant has not cited any authority for his position that section 115—4(j) is unconstitutional because it provides a "compromise" or "middle ground" for juries to accept. We are not persuaded that the possibility of a compromise verdict is a constitutional infirmity where the jury still must make a determination in the first instance between whether a defendant is guilty or legally insane based upon the evidence at trial. Defendant has also raised a number of policy issues concerning the wisdom of section 115—4(j). It is within the authority of the State legislature, however, to make such determinations.

Defendant next contends that as applied to him section 115—4(j) violated his constitutional right to due process. Defendant contends that he was not informed that the guilty but mentally ill instruction would be submitted to the jury until the instructions conference. This denied him the opportunity to ask questions on this verdict during *voir dire* and to solicit opinions on the degree of defendant's mental illness from his expert witnesses. Defendant points out that on the first day of trial his counsel requested the trial judge to explain the law on insanity to the prospective jurors because they may have been confused by the publicity surrounding the enactment of section 115—4(j) just seven days before trial. At that time defense counsel also stated that she believed section 115—4(j) would not apply to the case and the court made no comments to the contrary. During the instructions conference, defense counsel stated:

> "And the fact is that this is the first time the defense has been advised that this [instruction] was even a possibility except informally off the record. And the State's Attorney and I don't take what we say off the record seriously. So, really, I anticipated that the State might do this but this defendant has not been apprised that this law would apply to him during the course of his trial."

■ It is clear from defense counsel's statements on the record that she knew sometime before trial had ended that the State might

request a section 115—4(j) instruction. The record indicates that the court in fact requested the State to submit an instruction under section 115—4(j). In *People v. Pote* (1975), 26 Ill. App. 3d 742, 326 N.E.2d 236, the court found that a defendant was not denied due process because no mention was made of the fact that the State would request a manslaughter instruction in defendant's trial for murder until the instruction conference. The court reasoned that defense counsel must be deemed to be aware that lesser charges are included in the offense of murder, that counsel was not precluded from presenting a defense of the manslaughter charges, and, that counsel did not request additional time for presentation of his defense once he learned of the instruction. Likewise, in the present case, the defense knew of the enactment of the new law, learned sometime prior to the instruction conference that the State might request the guilty but mentally ill verdict and yet did not request a continuance or that evidence be re-opened by reason of surprise.

■ Defendant also argues that he was denied due process because the jury was not clearly instructed on the law with respect to guilty but mentally ill verdict. The court instructed the jury quoting from the statute: "A person is guilty but mentally ill if at the time of the commission of an offense he was not insane but was suffering from a mental illness." The court then instructed the jury on the definition of mental illness quoting section 6—2(d) verbatim. We find that this issue has been waived by the defendant's failure to object to the language of the instructions submitted by the State or to offer an alternative instruction. *People v. Springs* (1972), 51 Ill. 2d 418, 283 N.E.2d 225, *appeal dismissed* (1972), 409 U.S. 908, 34 L. Ed. 2d 169, 93 S. Ct. 252.

The instructions given were sufficiently clear to inform the jurors of the findings necessary under the laws applicable to the case. Furthermore, it is established that a defendant is not entitled to an instruction on the consequences of the various verdicts that may be returned in a case involving the insanity defense. *People v. Pitts* (1982), 104 Ill. App. 3d 451, 432 N.E.2d 1062.

■ Finally, defendant argues that the confusion of the jury in this case is demonstrated by a written question the jury sent to the trial judge during deliberations. The State contends that, to the contrary, the question demonstrates that the jury understood their verdict choices, would have found defendant guilty if instructions on the mentally ill verdict had not been given, and properly applied the law. We agree. The question read:

"The verdict 'Guilty of Murder' is explained by a statement

that begins with the sentence: 'To sustain the charge of murder \*\*\*' and also includes three propositions that must be proved. The jury unanimously agrees that the state has proved all these propositions beyond a reasonable doubt.

The verdict 'We the jury, find beyond a reasonable doubt that the defendant Paul DeWit committed the murder of Everett Clarke; and that the defendant, Paul DeWit was not legally insane at the time of the murder, but that he was mentally ill' is explained only by the single sentence 'A person is guilty but mentally ill if at the time of the commission of an offense he was not insane but was suffering from a mental illness.'

The jury will render a unanimous decision in favor of the second verdict if we can confirm our understanding that this verdict does not contradict the three propositions incorporated in (1)—but essentially adds the qualifications of mental illness."

Under the circumstances of this case, we are not convinced that the use of the guilty but mentally ill verdict confused the jury or otherwise offended due process for the reasons defendant suggests.

Defendant next contends that section 115—4(j) is unconstitutional because it does not serve any legitimate purpose to justify its enactment. Defendant argues that since the Illinois guilty but mentally ill provisions do not mandate treatment for the mentally ill offender, these provisions are no different than provisions already enacted. Under both the pre-existing law and the mentally ill offender provisions, the Department of Corrections has the authority to order psychiatric treatment for convicts and to transfer such convicts to the Department of Mental Health and Developmental Disabilities. (See Ill. Rev. Stat. 1981, ch. 38, par. 1003—8—5.) Defendant asserts that the guilty but mentally ill provisions add nothing to the pre-existing law and, therefore, the only reason justifying their enactment can be to discourage the verdict of not guilty by reason of insanity and to burden a defendant's choice to assert the insanity defense.

■■ Although defendant does not specify the constitutional basis for this argument, we believe this issue is controlled by a recent supreme court decision which upheld the constitutionality of the plea of guilty but mentally ill under an equal protection challenge. (*People v. Kaeding* (1983), 98 Ill. 2d 237, 456 N.E.2d 11.) In *Kaeding*, a defendant challenged section 5—2—6 of the Unified Code of Corrections (Ill. Rev. Stat. 1981, ch. 38, par. 1005—2—6), which provides for the treatment of defendants found guilty but mentally ill under sections 115—2, 115—3, or 115—4. The court found that section 5—2—6 neither threatens a fundamental right nor is directed toward a suspect class.

The court stated that the legislature, "did not intend that either the court or the Department would be required to utilize limited resources, facilities and skilled personnel in treating those defendants *** for whom treatment would not be helpful." (*People v. Kaeding* (1983), 98 Ill. 2d 237, 244-45, 456 N.E.2d 11, 16.) The court concluded that the statutory allocation of power over the rehabilitative programs was a rational means of furthering the legislative purposes underlying the Uniform Code of Corrections.

## IV

Defendant next contends that he was denied a fair trial by the cumulative instances of prosecutorial misconduct. Defendant argues that the prosecutor repeatedly implied during witness examination that the defense had manufactured the insanity defense. This alleged improper cross-examination consisted of questions of each defense witness as to when the witness was first contacted by defense attorney Edward Mogul and whether Mogul had arranged an interview for that person at the Issac Ray Center. Defendant argues that these comments were especially prejudicial because defendant's medical experts testified that they reviewed reports of these interviews prior to reaching a decision on defendant's sanity. The State contends that it could fairly bring out at trial the fact that the defense psychiatrists had not made an independent investigation of defendant's background, but rather had relied on information made available by defendant's attorney. We have reviewed these questions and determine that they were not improper. The State could fairly appraise the jury of the sources of information on defendant's life that formed a basis of the psychiatrists' opinions.

Defendant also contends that during closing argument the State allegedly accused defense attorney Mogul of manufacturing the insanity defense. Defendant complains about several comments, particularly the following colloquy:

"I submit to you that beginning with the appearance of Mr. Mogul at the police station on September 11th following through with the letter to Mr. Mogul from Dr. Jensen, following through all the way to today, that the defendant in keeping with his profession had been acting in a play directed by Mr. Mogul.

MISS PROPES: Objection, your Honor.

THE COURT: Sustained.

MR. KAPLAN: With the supporting casts that you have heard, LoMonto, Brown, Riley and Washington. It's ironic that

Everett Clark's body was found on the stage."

The State argues that it did not accuse the defense of trickery or of manufacturing the insanity defense. The State contends that this case is similar to *People v. Stewart* (1973), 12 Ill. App. 3d 226, 297 N.E.2d 391, where the court held that a prosecution comment that three defense witnesses " '\*\*\* were well coached, those witnesses testified to the same thing' " (12 Ill. App. 3d 226, 231, 297 N.E.2d 391, 394), was permissible because the prosecutor said nothing about trickery or impropriety on the part of the defense counsel.

■■ ■ We note that the trial court sustained defendant's objections to the comments at issue and on several occasions instructed the jury to disregard them. Where the court sustains an objection and instructs the jury to disregard a remark, usually the error is corrected and the prejudicial effect cured. (*People v. Baptist* (1979), 76 Ill. 2d 19, 30, 389 N.E.2d 1200, 1206.) Improper remarks, however, will constitute reversible error where they result in substantial prejudice to the defendant. (*Baptist*.) Although the comments quoted above are highly improper and reprehensible, we are not persuaded that under the facts and circumstances of this case they substantially prejudiced defendant. There was evidence from which the jury could conclude that defendant was sane beyond a reasonable doubt. He fled from the scene of the crime, he lied to the police to avoid participating in a lineup, and several lay and expert witnesses testified to defendant's sanity. The prosecutor's statements, though improper, do not warrant reversal in this case. *People v. Ford* (1983), 118 Ill. App. 3d 59, 454 N.E.2d 1095.

■■ Defendant also objects to a line of questioning by the prosecutor which defendant contends improperly made an issue of the fact that defendant's trial attorney, Lorna Propes, was a former assistant State's Attorney and had prosecuted cases where the defense was insanity. Propes cross-examined a State expert witness using the transcript of the expert's testimony in another trial. The defense then made a motion *in limine* to prohibit the State from revealing that Propes had prosecuted the trial and that the defense was insanity. The court denied the motion and on redirect the State brought out these facts. Although the reference to Propes' former employment were irrelevant, they were made in response to matters brought out by the defense and are, therefore, excusable. See *People v. Moore* (1969), 42 Ill. 2d 73, 79, 246 N.E.2d 299, 303, *modified* (1972), 408 U.S. 786, 33 L. Ed. 2d 706, 92 S. Ct. 2562.

■■ Defendant contends that the prosecutor on several occasions continued a line of questioning after the court had sustained a defense

objection to it. The State contends that in the case which the defendant relies upon (*People v. Weinger* (1981), 101 Ill. App. 3d 857, 428 N.E.2d 924), the prosecutor had repeated questions after a sustained objection on 20 occasions unlike the three instances complained of in this case. We have reviewed the record and determine that the instances were not prejudicial to defendant. Defendant strongly argues that he was prejudiced when the prosecutor persisted in asking Officer O'Brien if he believed that the argument between LaMonto and defendant was basically a domestic argument between roommates after an objection to that question had been sustained. We note that the defense had already brought out the fact that the defendant told Officer O'Brien that he was LaMonto's former roommate. In light of that testimony, the improper questioning did not decrease the credibility of LaMonto.

▇▇▇ Next, defendant contends that the prosecutor attempted to arouse the prejudice of the jury by twice stating that a finding of not guilty by reason of insanity would be equivalent to letting defendant go free. Defense objections to both remarks were sustained and the jury was instructed to disregard the remarks. Under similar circumstances the supreme court, in *People v. Greer* (1980), 79 Ill. 2d 103, 402 N.E.2d 203, held there was no reversible error.

▇▇▇ We have reviewed the prosecutorial misconduct of which defendant complains and are not persuaded that its cumulative effect denied defendant a fair trial. The trial court sustained objections to the improper remarks and in many instances instructed the jury to disregard them. There was ample evidence on which the jury could find that defendant was guilty but mentally ill beyond a reasonable doubt. The instances of prosecutorial misconduct did not constitute a material factor in defendant's conviction nor result in substantial prejudice to him. *People v. Witted* (1979), 79 Ill. App. 3d 156, 398 N.E.2d 68.

## V

The final issue raised on appeal concerns defendant's right to view certain records kept by the Chicago police department known as "street files." Defendant contends that after he was sentenced he learned that the police department had "street files" in many criminal cases but did not reveal the existence of these files or the information contained therein to the prosecution or the defense. Defendant filed both a section 72 petition (Ill. Rev. Stat. 1979, ch. 110, par. 72), and a mandatory injunction seeking any information contained in the "street files" on defendant. Pursuant to a subpoena, the records were

submitted to the trial court and reviewed by the court *in camera*. After reviewing the records, the trial court concluded that they lacked probative value to the defense, denied the section 72 petition, and refused to tender the records to the defense. Defendant contends that the refusal to tender these files to defendant violated Supreme Court Rule 412 since defense counsel and not the court is the proper party to determine whether the information contained therein is material to the defense.

The State argues that the procedure of *in camera* inspection is authorized by Supreme Court Rule 415(f) (87 Ill. 2d R. 415(f)). Further, the State contends that the issue of the "street files" is not properly before this court. We find, however, that we need not determine the jurisdictional issue. Subsequent to oral argument on this case, the parties informed this court that there were, in fact, no "street files" concerning defendant. The records reviewed *in camera* by the trial court consisted merely of police reports, copies of which were made available to the defense prior to trial. The trial court did not abuse its discretion in reviewing the subpoenaed records *in camera*. 87 Ill. 2d R. 415(f).

For the foregoing reasons, defendant's conviction is affirmed.

Judgment affirmed.

McGLOON and GOLDBERG, JJ., concur.