THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
JOSHUA FIERER, Defendant-Appellant.

Third District   No. 3—86—0128

Opinion filed January 14, 1987.

650

HEIPLE, J., concurring in part and dissenting in part.

Thomas J. Penn, Jr., of Peoria, and Nathan Lewis and Mary L. Lyons, both of Miller, Cassiday, Larroca & Lewis, of Washington, D.C. (Nathan Lewis, of counsel), for appellant.

Erik I. Blanc, State's Attorney, of Pekin (Gerald P. Ursini, of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE STOUDER delivered the opinion of the court:

Defendant, Joshua Fierer, was charged in a five-count information with the murder of his wife in violation of section 9—1 of the Criminal Code of 1961 (the Code) (Ill. Rev. Stat. 1985, ch. 38, par. 9—1). Following a jury trial, Fierer was found guilty but mentally ill on the charge of murder in accord with section 115—4(j) of the Code (Ill. Rev. Stat. 1985, ch. 38, par. 115—4(j)). Fierer was sentenced to a 30-year term of imprisonment on count I of the information, with judgment deferred on the remaining four counts.

Fierer and his wife were married in 1959. In January 1984, the

couple agreed to a divorce and Fierer filed the petition. In December 1984, the couple met at the family home to divide the marital property. Also present in the home that day were the court-appointed guardian *ad litem* for the children and two movers. None of the visitors in the house saw the events that took place, but when one of them heard a commotion in the other room, he ran in to see Fierer kneeling over his ex-wife, his elbows moving rapidly, and blood on the closet wall. The witness was unable to physically remove Fierer from over the body and when he hit Fierer over the head with a record carrying case, there was no reaction. Fierer later stated that he had gone to the kitchen for a garbage bag, and when he returned he knelt down next to his ex-wife, who was kneeling in the closet. The next thing he noticed was a knife coming at him. The last thing that Fierer remembered was grabbing the knife by the blade and trying to wrestle it from his ex-wife.

There was no question that Fierer committed the acts that resulted in the death of his wife, rather the issues raised by the parties on appeal arise from alleged improprieties in the evidence admitted and the court's submission to the jury of the guilty but mentally ill (GBMI) verdict alternative. Fierer contends that the GBMI verdict violated his due process rights under both the Illinois and Federal constitutions, that it was not warranted by the evidence, and that even if warranted by the evidence, the instruction as given was not in accord with Illinois law. Fierer's contentions in regard to the evidence admitted are (1) that the trial court erroneously admitted 15 gruesome and bloody slides of the victim's body, and (2) that the State should not have been permitted to cross-examine Fierer about the discovery of potassium cyanide and secobarbital in the trunk of his car or the newspaper article discovered in his bedroom. For the following reasons, we find that the defendant is entitled to a new trial.

I. THE GBMI VERDICT

During closing arguments, both counsel for the State and counsel for the defendant made statements that the verdict of GBMI was not warranted by the evidence. That this created a conflict in the minds of the jurors is strongly supported by the record and the dialogue that occurred between the judge and the jury when the jury questioned the judge as to what verdict forms they were allowed to use and a statement made by the jury foreperson "that we couldn't use" one of the verdicts. This statement, as Fierer points out in his brief, related to the "agreement" by the parties that the GBMI verdict was not warranted by the evidence in this case.

Initially, we address Fierer's contention that the GBMI verdict violates his due process rights under the Illinois and Federal constitutions. Fierer contends that "[a]uthorizing a jury to find a defendant 'guilty but mentally ill' deprives an accused of liberty without due process of law because it introduces into the jury's fact-finding task a consideration that is wholly extraneous to the jury's function and that diverts the jury's attention from its primary duty." This is not the first time that the constitutionality of the guilty-but-mentally-ill statute has been challenged.

In *People v. DeWit* (1984), 123 Ill. App. 3d 723, 463 N.E.2d 742, the defendant contended that the GBMI verdict promotes jury confusion and encourages a finding of GBMI as a compromise. The defendant argued that the distinction between legal insanity and mental illness is likely to be incomprehensible to the average juror since the definitions overlap and are poorly conceptualized. The *DeWit* court reiterated the well-established principle that to survive a challenge of denial of due process, a statute may not be so vague that men of common intelligence must necessarily guess at its meaning. The statute must also provide sufficiently definite standards of law-enforcement officials and triers of fact so that its application does not depend merely on their private conceptions. The court went on to hold that section 115—4(j) expresses its requirements in simple and clear language and that the definition of mental illness provides meaningful standards for a jury to make the required findings. (123 Ill. App. 3d 723, 735-36, 463 N.E.2d 742, 750.) Although plainly and simply stated by the *DeWit* court, we find it necessary to note that it remains to be seen, and only experience will show, whether a jury can formulate a clear and understandable conceptualization of the distinction between legal insanity and mental illness when reaching a verdict of GBMI.

Although we uphold the constitutionality of the statute, we find that the inaccuracy of its presentation to the jurors and the remarks of counsel during closing argument, which remained unclarified by the court in its exchange with the jury foreperson, are the aspects in this case which lead to our conclusion to remand this case for a new trial. Fierer contends that the remarks of both counsel during closing arguments lead to the conclusion that some type of "deal" was reached and that the GBMI verdict was unwarranted by the evidence and, therefore, inapplicable in this case. We would agree if this was a decision to be made by the attorneys. However, the statute specifically states that "[w]hen the affirmative defense of insanity has been presented during the trial, the *court*, where warranted by the evidence, shall also provide the jury with a special verdict form of

guilty but mentally ill." (Emphasis added.) (Ill. Rev. Stat. 1985, ch. 38, par. 115—4(j)).) The statute is clear that this is a function of the trial court and not a decision to be made by the attorneys. Unfortunately, the trial court did not clarify this matter with the jury, which was confused by the comments of counsel that such a verdict was inapplicable to the present case. If the trial court had told the jury that counsels' closing arguments were simply their last opportunity to address them and not a statement of the applicable law of the case, there was a possibility that this confusion would have been avoided. Although it is within the discretion of the trial court to submit this special verdict to the jury when it determines that it is warranted by the evidence, we would place the following caveat on reaching such a determination. When neither party propounds the submission of the GBMI verdict form, and in fact each opposes the giving of such an instruction, the trial court must exercise great care in tendering this special verdict form to the jury. As in this case, when neither party is of the opinion that the GBMI verdict is warranted by the evidence, a substantial basis must exist for its submission to the jury.

■ Even if this confusion had been avoided, the verdict form, as presented to the jury, inaccurately stated the law in such a way that an invalid determination was inevitable. Although the State claims that Fierer has waived this issue on appeal by not objecting to the instruction or raising it in his post-trial motion, we find that this falls within the boundaries of the plain-error doctrine. Although the failure to object to a jury instruction generally constitutes a waiver (*People v. Roberts* (1979), 75 Ill. 2d 1, 387 N.E.2d 331), where the errors are so grave as to affect the defendant's right to a fair and impartial trial, the plain-error doctrine set forth in Supreme Court Rule 451(c) (87 Ill. 2d R. 451(c)), provides for an exception to the rule that a party may not assert an error if he has permitted an erroneous instruction to reach the jury (*People v. Ogunsola* (1981), 87 Ill. 2d 216, 429 N.E.2d 861). Thus, under the plain-error doctrine, we will consider the alleged error.

■ The first error with the instructions deals with the burden of proof stated by the trial court. At trial, the court informed the jury that they could return a verdict of guilty but mentally ill if they found: (1) that beyond a reasonable doubt, the defendant had committed the offense, (2) that by a preponderance of the evidence, the defendant was sane at the time of the commission of the offense, and (3) that beyond a reasonable doubt, the defendant was mentally ill at the time of the commission of the offense. Put simply, this misstates the applicable burden of proof. Section 115—4(j) clearly states that

"such special verdict [of GBMI] requires a unanimous finding by the jury beyond a reasonable doubt that the defendant committed the acts charged and that the defendant was not legally insane at the time of the commission of those acts but that he was mentally ill at such time. (Ill. Rev. Stat. 1985, ch. 38, par. 115—4(j).) The statute specifically requires that the jury determine that all three elements are present beyond a reasonable doubt. The determination by the trial court that the second element be shown only by a preponderance of the evidence was erroneous.

The second error with the instructions as the inclusion of a modified version of the second paragraph of Illinois Pattern Jury Instruction, Criminal, No. 24—25.01 (2d ed. 1981) (hereinafter IPI Criminal 2d). Over defense objection, the trial court added the following sentence: "Abnormality manifested only by criminal, or otherwise antisocial conduct, is not mental disease or mental defect." This sentence is a modification of IPI Criminal 2d No. 24—25.01 in that it eliminates the word "repeated" immediately preceding the word criminal in the first clause of that sentence. The trial judge stated that, "I have no idea why the Legislature put the term repeated in there, if repeated criminal antisocial conduct is not a mental disease or defect, certainly an isolated one would not be."

When the Illinois Supreme Court Committee on Pattern Jury Instructions in Criminal Cases prepared this portion of IPI Criminal 2d No. 24—25.01, the Committee Note specifically stated that the second paragraph of the instruction should be given "only when the evidence shows repeated criminal or other anti-social conduct." (IPI Criminal 2d No. 24—25.01, Committee Note.) This paragraph was prepared by the committee in light of that portion of the definition of mental disease or mental defect contained in section 6—2(b) of the Code. That section states that "[t]he terms 'mental disease or mental defect' do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct." (Ill. Rev. Stat. 1985, ch. 38, par. 6—2(b).)

■■■ The Illinois Supreme Court has held that repeated criminal or otherwise antisocial conduct is expressly excluded from the purview of the terms mental disease or mental defect. (*People v. Ward* (1975), 61 Ill. 2d 559, 338 N.E.2d 171.) Further, personality disorders such as sociopathic personalities are not mental diseases within this section. (*People v. Smothers* (1971), 2 Ill. App. 3d 513, 276 N.E.2d 427, *aff'd* (1973), 55 Ill. 2d 172, 302 N.E.2d 324.) The plain meaning of this paragraph, when added to the instruction, is to exclude the possibility that a defendant can raise the defense of insanity when the

*only* evidence presented is that of repeated criminal or antisocial conduct. Therefore, the trial court's modification and addition of this paragraph to the jury instruction was improper.

The instruction given in this case was particularly prejudicial in light of the psychiatrists' trial testimony. The testimony revealed that Fierer had experienced what is termed an "isolated explosive disorder," which involves a criminal impulse that is alien to one's normal behavior. The incident also resulted in a psychogenic amnesia from which Fierer had not fully recovered at the time of trial. To eliminate the word "repeated" from the jury instruction would appear to effectively eliminate Fierer's condition, as testified to by the psychiatrists, as a basis for the GBMI verdict.

## II. THE PHOTOGRAPHS

The next issue Fierer raises on appeal is the introduction at trial of 15 allegedly gruesome and bloody color photographs projected on a large screen. The 15 photographs in question were part of 25 photographs introduced into evidence and depicting the victim as she was found in the house and while being examined during the autopsy. Fierer contends that these photographs, projected as they were, unduly inflamed and prejudiced the jury and affected the outcome of the case.

The Supreme Court of Illinois has enunciated the general rule governing the admissibility of this type of photograph. Whether a photograph of a deceased person should be admitted into evidence rests within the discretion of the trial court. If the picture has sufficient probative value it may be admitted in spite of the fact that the photograph may be gruesome or inflammatory. However, in view of the prejudicial emotion that might be aroused by the introduction of a photograph of the victim, courts have been strict in the requirement that a proper purpose be shown for the introduction of the pictures. (*People v. Lefler* (1967), 38 Ill. 2d 216, 230 N.E.2d 827.) The trial court did not abuse its discretion in admitting the three pictures of the body as it appeared in the home. One of the issues at trial was Fierer's mental state, and pictures showing the position of the body and the number and type of wounds would be probative of that mental state and would be helpful in supplementing oral testimony.

The autopsy pictures pose an entirely different situation. The Illinois Supreme Court, as well as this court, has taken a position that would exclude this type of photo. (*People v. Lefler* (1967), 38 Ill. 2d 216, 230 N.E.2d 827.) Unlike the situation where pictures at the scene may explain and supplement the oral testimony of the witnesses, au-

topsy photos add nothing to a trial unless the cause of death is at issue and the photos are necessary to supplement the medical examiner's testimony. In *People v. Landry* (1977), 54 Ill. App. 3d 159, 368 N.E.2d 1334, this court reversed an involuntary-manslaughter conviction following a trial in which a number of gruesome autopsy pictures were admitted. We stated then, and we reiterate now, that such photographs are highly prejudicial because they tend to arouse the passions of the jury. The pictures were deemed highly prejudicial, while having minimal, if any, probative value, because they were "grisly pictures, not of external injury inflicted, but of the autopsy." (54 Ill. App. 3d 159, 161, 368 N.E.2d 1334, 1336.) Therefore, we hold that the trial court abused its discretion in admitting the autopsy photographs in light of their highly prejudicial content and slight relevance, if any, to a material issue in the case.

●10 However, we find no merit in Fierer's argument that showing the pictures to the jury by way of projecting them on a large screen was any more prejudicial than distributing them to the jury in an 8- by 10-inch format. Neither logic nor reason suggest that the manner of presentation is the determinative factor as to whether a photograph is highly prejudicial. Furthermore, Fierer's contention that the decision in *Lefler* suggests this conclusion is incorrect. *Lefler* determined that it was the content of the autopsy photographs displayed to the jury on the screen that was improper. The fact that the photographs were also projected on a screen in that case is not dispositive of the issue. The *Lefler* court did not specifically address the manner of presentation of the photographs, and we do not deem that decision to mean that the projection of any photograph on a large screen is improper or overly prejudicial.

III. Admission into Evidence and Cross-Examination as to the
    Cyanide, Secobarbital, and Newspaper Clipping

Fierer's next contention is that he was subjected to cross-examination on items improperly admitted into evidence. The items at issue are a bottle of potassium cyanide and a bottle of secobarbital found in the trunk of Fierer's car and a newspaper clipping found in his bedroom which dealt with an Iowa trial where a chiropractor killed his wife while they were going through divorce proceedings. Fierer contends that the admission into evidence of these articles was highly prejudicial and part of a "runaway inference program."

■■ ■ The general rule governing the admissibility of physical evidence is that it is admissible provided that there is evidence to connect it with the defendant and the crime. The distinction between the

admissibility of the evidence must not be confused with its probative value. It is not necessary that the object actually be used in the commission of the crime. It is only necessary that the object at least be suitable for the commission of the offense. (*People v. Free* (1983), 94 Ill. 2d 378, 447 N.E.2d 218.) Evidence will be deemed relevant, and therefore admissible, if it has a tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. The determination of whether evidence is admissible with regard to its relevancy is left to the discretion of the trial court. *People v. Miller* (1981), 98 Ill. App. 3d 453, 424 N.E.2d 624.

■■■ In this case, we cannot say that the trial court abused its discretion in admitting this evidence. One of the issues in this case was Fierer's mental state. The State sought the admission of this evidence to show premeditation. Fierer was given the chance on redirect to explain the existence of these articles. The inferences and explanations concerning this evidence go to its weight and not its admissibility.

IV. CONCLUSION

There were several other issues raised by the parties on appeal. However, because there will be a retrial on this matter and there is little likelihood of recurrence, there is no need to address them in this opinion.

For the foregoing reasons, the judgment of the circuit court of Tazewell County is reversed and this cause is remanded for a new trial.

Reversed and remanded.

SCOTT, P.J., concurs.

JUSTICE HEIPLE, concurring in part and dissenting in part:

In the instant case, the jurors were instructed by the court that if they found that, as a result of mental disease or mental defect, the defendant lacked substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law, then they should find the defendant not guilty by reason of insanity. In such case, the defendant *would not* be held criminally responsible for his conduct.

The jurors were also instructed that if they found the defendant was mentally ill but not insane, then they should find the defendant

guilty but mentally ill (GBMI). In such case the defendant *would* be held criminally responsible for his conduct. The trial court went on to define mental illness as a substantial disorder of thought, mood, or behavior which impaired the defendant's judgment but not to the extent that he is unable to appreciate the wrongfulness of his behavior or is unable to conform his conduct to the requirements of the law.

During their deliberations, the jurors addressed the following written question to the court, "Can Cronic [*sic*] Depression be the same as Mentally Ill? In Layman Terms. *Please!*" The posing of this question by the jurors indicates a lack of a grasp of a clear concept of mental illness. The question also causes me to speculate that, at the time the question was posed, the jurors were probably deliberating between a verdict of either guilty or guilty but mentally ill.

Writing for the majority, Justice Stouder has opined that "only experience will show whether a jury can formulate a clear and understandable conceptualization of the distinction between legal insanity and mental illness when reaching a verdict of GBMI." Certainly the introduction of this new GBMI verdict form into a criminal trial has introduced a high degree of confusion into the resolution of the insanity defense.

What, after all, are jurors to make of a choice between not guilty by reason of insanity and guilty but mentally ill? Is not an insane person suffering from mental illness? And, if an insane person is not suffering from mental illness, can we say that an insane person is mentally healthy? Taking the legal definition at face value, the demarcation line is that a legally insane person cannot either appreciate the wrongfulness of his behavior or conform his conduct to the requirements of the law and that a person who is merely mentally ill can do either or both of the above. But if that is all there is to it, what then has the GBMI verdict contributed to the administration of criminal justice? The answer is a compromise verdict.

The major impetus for the GBMI verdict is the fear that people who should be held accountable for their conduct will beat the system with a verdict of not guilty by reason of insanity. The introduction of this verdict form into a trial invites a compromise verdict from all of those jurors who either do not understand the distinction or who may believe that a defendant is insane but do not believe that he should be exonerated for that reason. Conceptually, the rendering of this verdict form makes no sense in any other context.

If the point of the verdict were to assure that mentally disordered persons received treatment, then the verdict is superfluous. Any person convicted of a crime who needs treatment is supposed to get

treatment. We don't ask jurors to isolate other conditions in their verdict forms, *e.g.*, guilty but diabetic or guilty but measled.

Part of the confusion, of course, is semantic and arises from the common and accepted practice of referring to behavioral patterns and conduct in terms of illness and disease, *e.g.*, alcoholism. Is a person who cooks soup in his hat and wears a tin pot on his head crazy? Probably. Is he diseased? I don't know. Any conduct which departs from the supposed norm these days is referred to as "sick." It is doubtful, however, if such terminology adds any meaning to useful discourse.

Having said that, I have to concur with the majority and with the decision in *People v. DeWit* (1984), 123 Ill. App. 3d 723, 463 N.E.2d 742, therein cited that the introduction of a GBMI verdict form into a criminal trial does not constitutionally deprive the defendant of procedural due process of law. I further concur that the trial judge misstated the People's burden of proof and that a reversal and remand for a new trial is thereby necessitated. I further concur that the definition-of-insanity instruction was improperly modified by the addition of language to the effect that abnormality manifested only by criminal, or otherwise antisocial conduct, is not mental disease or mental defect. The stated language was in a People's instruction, was objected to by defendant, and was a modification of bracketed material set out in the second paragraph of Illinois Pattern Jury Instruction, Criminal, No. 24—25.01. I would have serious reservations as to whether that bracketed material should ever be given in any case. Certainly it was error to include it in this one.

Beyond the above, I see no error in the admission of the autopsy photographs in this case and accordingly dissent from that portion of the majority opinion. That the photos were gruesome is of no moment. The defendant was offering an insanity defense in this case. Gruesome photos such as those introduced in evidence would not have been prejudicial to the defense of not guilty by reason of insanity. Indeed, the very gruesomeness of the photos may have been an aid to the defense.

Furthermore, one critical issue at trial was whether the defendant acted in self-defense after his wife attacked him with a knife. One of the most important facts in deciding this issue is the nature of the wounds on the hands of the victim and the defendant. While using slide photographs of the hand wounds of the victim and the defendant to illustrate his opinion, Dr. Donoghue testified that he believed the defendant's wounds were caused by slippage onto the knife blade during the stabbing and the victim's wounds were defensive. Two other

doctors testified that the defendant was insane when he committed the murder, but admitted that had the defendant obtained the knife from the kitchen, their diagnoses would be different. It is clear that the photographs of the victim's hands were relevant to the issues of self-defense and insanity. Without these photographs, the jury would have been unable to compare the victim's wounds with the defendant's and thus would have been deprived of information crucial to the determination of whether the defendant was insane or acted in self-defense.

The majority's reliance on *Lefler* and *Landry* to justify exclusion of the autopsy photographs is misplaced. In both of those cases, the gruesomeness of the photographs was attributed to the autopsy procedure. In the instant case, the photographs were taken after the blood was washed from the victim's body but before the autopsy began. The victim's body had not been altered by any autopsy procedures, therefore, the gruesomeness of the photographs is solely attributed to the acts of the defendant, not to the autopsy.

The majority correctly stated, "One of the issues at trial was Fierer's mental state and pictures showing the position of the body and the number and type of wounds would be probative of that mental state and would be helpful in supplementing oral testimony." The pictures of Mary Fierer's body in the home showed the position of the body, but the wounds were difficult to discern because her body was fully clothed and covered with blood. In the photographs taken in the autopsy room, however, the body had been washed and the stab wounds were clearly visible. Since the autopsy photographs were more illustrative of the 27 stab wounds, were probative of the defendant's mental state, and were not rendered more gruesome or prejudicial by the performance of any autopsy procedures, the majority incorrectly determined that the trial court erred in admitting the photographs.

For the reasons stated, however, the judgment of the circuit court of Tazewell County must be reversed and the cause remanded for a new trial.