THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CHOUDARY AHMAD, Defendant-Appellant.

First District (6th Division) No. 1—88—0941

Opinion filed November 30, 1990.

Michael J. Pelletier and Mitchell Katten, both of State Appellate Defender's Office, of Chicago, for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Renee Goldfarb and David R. Butzen, Assistant State's Attorneys, of counsel), for the People.

JUSTICE RAKOWSKI delivered the opinion of the court:

Defendant was charged with the murder of Syed Shah, but he was initially found unfit to stand trial. However, at a subsequent reinstatement hearing defendant was found fit for trial and was tried before a jury. Following instructions to the jury on the verdicts of guilty, not guilty, not guilty by reason of insanity and guilty but mentally ill, the jury found defendant guilty of murder. He was subsequently sentenced to a term of 26 years. The issues raised on appeal are: (1) whether defendant was denied his constitutional right to due process because the guilty but mentally ill instruction injected irrelevant issues into the determination of guilt or innocence; (2) whether the trial court's failure to properly instruct the jury on the statutory elements and burden of proof for the guilty but mentally ill verdict was plain error; (3) whether defendant was deprived of his right to be found guilty but mentally ill because the statute in effect at the time of his trial created a class of defendants who could not prove their insanity by a preponderance of evidence, and who could not be found guilty but mentally ill because the State could not prove their sanity beyond a reasonable doubt; (4) whether the trial court's determination that defendant was fit to stand trial was proper; (5) whether defendant was denied his right to a fair trial where the State argued that defendant's assertion of his right to remain silent was evidence that he was sane; (6) whether the State's expert witness' misstatement of the law regarding defendant's burden of proof in establishing the insanity defense deprived him of a fair trial; and (7) whether defendant's conviction should be reduced from guilty to guilty but mentally ill.

Jack Mashni testified for the State that on the evening of June 17, 1986, he owned the Granville Liquor Store, which was located at

1102 West Granville Avenue in Chicago. Around midnight, the victim and a companion were in the store when defendant arrived with a man by the name of Bobby Israel. Defendant and the victim started arguing, and Mashni asked the four men to leave. Mashni stated that defendant did not appear to be intoxicated at that time. Sometime after Mashni asked the men to leave, he looked outside and saw defendant lying on the ground. After contacting the police, he received a telephone call from Will Garrison, the manager of the apartment building across the street from the liquor store. Garrison told Mashni that someone was coming over with a knife. Shortly thereafter, the victim returned to the store and went to the bathroom. Defendant then arrived, but Mashni asked him to leave which he did. Mashni initially persuaded the victim to remain in the store, but after a short period of time, he left the premises. Mashni testified that sometime after the victim left, someone came to the store and reported that there had been a stabbing. Mashni went outside and saw the victim lying on the ground.

Will Garrison testified for the State that he had known defendant approximately four weeks, and that defendant shared an apartment with Bobby Israel in the same building that Garrison lived in and managed. Garrison corroborated Mashni's testimony regarding the events prior to the stabbing. He further testified that defendant and Israel followed the victim after he left the liquor store, and that defendant caught up with him and stabbed him in a downward motion over the right shoulder. Garrison stated that the next thing he saw was the victim fall to the ground. Defendant then ran back to the apartment building.

Deborah Ezell testified that at around midnight on the night of the stabbing she parked her car on the corner of Granville and Winthrop Avenues and started walking toward the liquor store. She then saw a man stab the victim with a serrated butcher knife, and she ran back to her car. When she saw defendant leave the scene, she approached the victim and found that he had been stabbed several times.

Officer Fred Vitek of the Chicago police department testified that in the early morning hours of June 18, 1986, he responded to a call that there had been a stabbing at 1109 West Granville. When Vitek arrived, he saw the victim's body with several chest wounds. He called for an ambulance and spoke with several people at the scene of the incident. Vitek was told that the offender lived in the apartment building on that street, and he was given a description of defendant. Vitek further testified that he went to the apartment building and

saw defendant standing in the window. He contacted the police station, gave them a description of defendant and proceeded to defendant's apartment to look for him. Several other officers were at defendant's apartment when Vitek arrived, but defendant was gone. Vitek also noticed that the window of the second-floor landing which led to the roof of an adjacent building was broken, and the metal bars had been removed.

Officer William Stump testified that he arrived at the scene of the incident at around 12:24 a.m. He spoke with Bobby Israel and then began searching the area for defendant. A short time later Stump found defendant in a taxi cab, and he saw that defendant had blood on his shirt. Stump identified himself as a police officer and asked defendant to step out of the taxi cab. When defendant stood up, he was searched by Stump, and a knife was found in his possession. Defendant was then taken to the police station. Stump stated that he observed nothing unusual about defendant's behavior. He was able to provide information regarding his height, weight, birthdate, place of birth and occupation. On the arrest report, Stump indicated that defendant had been drinking, but he testified that he did not believe he was intoxicated. Stump further testified that defendant was cooperative, peaceful, followed all orders and answered all questions.

Detective Phillip Manion testified that he interviewed defendant after advising him of his *Miranda* rights and that defendant acknowledged that he understood his rights. When Manion initially asked defendant about the stabbing, defendant stated that he and the victim had an argument and that the victim stabbed himself. Manion then told defendant that his story was not believable. Defendant stated that he had been drinking and could not remember what had happened, but he thought someone else had stabbed the victim. At that point, defendant stated that he did not want to talk anymore, and the interview was terminated.

The parties stipulated that, based on the findings of criminalist Pamela Fish, the bloodstains found on defendant's shirt were those of the victim.

In support of his insanity defense, defendant presented the testimony of several friends and relatives as well as a psychiatrist. Choudary Ahmad, defendant's nephew, testified that he had known defendant since they were both children living in Pakistan. Ahmad had come to the United States in 1982, and he shared an apartment with defendant until his marriage two years later. According to Ahmad, defendant had worked hard as a cab driver and had many friends. However, in 1984, defendant's behavior began to change. He

started drinking, worked fewer hours, became easily upset and neglected his appearance. Defendant moved in with Ahmad until Ahmad sent him to Pakistan. Defendant returned several months later and again moved in with Ahmad and his wife. Ahmad testified that defendant's behavior had not improved. Defendant told Ahmad that he had money coming from Pakistan, which was not true, and he frequently argued with his friends. Ahmad reported an instance when he told defendant that he should go to work, and defendant threw a bottle at him. Ahmad sent defendant to Pakistan a second time because he was afraid defendant would harm someone. Defendant returned nine months later and moved back in with Ahmad. At that time, defendant exhibited paranoid delusions that people from the Mafia were following him, and he accumulated excessive telephone charges. At one point defendant hit Ahmad's wife, and Ahmad ordered him to move out. Defendant then moved in with a friend. In January 1986, Ahmad brought defendant to Read Mental Hospital, but defendant left after a few days.

Mohammed Tahir testified that he had known defendant since 1984. Tahir also testified that defendant had been friendly, dressed well and worked hard as a cab driver, but that his behavior was not normal when he returned from his first trip to Pakistan. At that time, defendant claimed that the late Mayor Harold Washington and former President Ronald Reagan were his friends. Tahir also corroborated Ahmad's testimony regarding defendant's behavior after his return from his second trip to Pakistan.

Defendant's former fiancee, Maria Casares, testified that when she met defendant in 1982, he was quiet, sensitive, gentle, dependable and hard working. In 1985, she and defendant became engaged, and shortly thereafter, he started acting abnormally. He looked distant, lacked emotion, talked irrationally and would hear voices. Casares stated that when defendant returned from his second trip to Pakistan he did not work and had tremors.

Casares stated that she was with defendant on the day of the stabbing. They met to finalize their wedding plans, and, at one point, they had a conversation about defendant's former marriage. They then went to a restaurant where defendant met some friends. At around 9 p.m. defendant drove her home. During the drive home, they had an argument about wedding plans.

Dr. Conroe, a private psychiatrist, testified that in his opinion, defendant was legally insane at the time of the stabbing. He stated that defendant suffered from paranoid schizophrenia and drug and alcohol abuse. Conroe further stated that the schizophrenia was aggra-

vated by the substance abuse. He stated that his opinion was based on his review of police reports, the eyewitness accounts of the stabbing, defendant's medical records from mental hospitals in the United States and his conversations with defendant's former fiancee and nephew. Conroe testified that Casares had reported a conversation in which defendant told her that the victim had said he was jealous of defendant and had threatened to harm Casares. Conroe also examined defendant while he was in the Cook County jail. Defendant told Conroe that he did not remember the stabbing or anything else that night after 9 p.m. According to Conroe, defendant stated that he had been using one gram of cocaine and drinking about 12 beers a day. Defendant said that he had been using marijuana and cocaine when he was with Casares on the day of the stabbing. Casares had told Conroe that defendant had smoked marijuana, but she knew of no cocaine use. Conroe testified that his diagnosis was consistent with the information in defendant's medical records from Lahore Government Mental Hospital in Pakistan. According to these records dated October 3, 1984, defendant's behavior was described as aggressive, violent and argumentative with paranoid ideation. At that time, defendant was treated with tranquilizers and shock treatment. Within several weeks, his condition had improved, and he was paroled for 10 days, but he failed to return to the hospital. On May 13, 1985, defendant was again admitted to the Lahore Mental Hospital. At that time, the records stated that defendant had a relapse of symptoms and exhibited a violent, aggressive and paranoid attitude with a gross thought disorder. He was diagnosed as suffering from paranoid schizophrenia and treated with shock treatment and several antipsychotic medications. Defendant's condition improved, but he again failed to continue treatment after his parole.

In rebuttal, Dr. Matthew Markos, a psychiatrist specializing in forensic psychiatry, testified that it was his opinion that defendant was not legally insane at the time of the stabbing. Markos based his opinion on his four examinations of defendant after the stabbing, his review of police reports and hospital records from defendant's 1986 and 1987 admissions at Read mental health facility as well as his 1987 admission to Elgin State hospital. Markos also reviewed the reports of Dr. Michael Rabin of the Psychiatric Institute of Cook County. Rabin had performed tests in May 1987, to evaluate defendant's cognitive functions and any existing psychosis. He also performed an electroencephalogram which showed no organic brain pathology. Markos then testified regarding his knowledge of the standard of the American Law Institute regarding the insanity defense.

Markos first examined defendant in January 1987 and concluded that he was suffering from psychotic episodes of a paranoid schizophrenic type, substance abuse and that he exhibited antisocial personality traits. However, he also indicated that defendant's behavior during his hospitalization at Read Mental Hospital was probably more consistent with a drug-induced psychosis than schizophrenia. He also stated that during this hospitalization, defendant was diagnosed as suffering from a personality disorder and substance abuse. Markos again examined defendant on February 2, 1987, but found that his condition had not improved. He examined defendant the third time on April 20, 1987, and found him to be cooperative and coherent despite the fact that defendant complained of hearing voices, mood swings and insomnia. The fourth time Markos examined defendant was on May 27, 1987. He concluded that defendant was sane at the time of the stabbing, that his inability to remember the incident was inconsistent with his ability to discuss it with the police immediately after its occurrence and that his conduct with the police was goal directed and voluntary. Markos opined that defendant could have stabbed the victim as a result of anger or antisocial behavior. He also stated that he considered the records of defendant's hospitalization in Pakistan incomplete because they did not include an admission history, reason for the diagnosis of paranoid schizophrenia, course of treatment, description of defendant's behavior during hospitalization or discharge plans. During closing argument, the State argued that defendant's exercise of his right to remain silent and terminate the police interrogation showed that he was sane. The jury was then instructed on the verdicts of guilty, not guilty, not guilty by reason of insanity and guilty but mentally ill.

■■ Defendant contends that authorizing the jury to find a defendant guilty but mentally ill introduces into the jury's fact-finding task a consideration that diverts the jury's attention from its primary task of determining defendant's guilt or innocence. The guilty but mentally ill (GBMI) instruction is governed by section 115—4 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1987, ch. 38, par. 115—4(j)). The relevant portion of the statute provides:

"When the affirmative defense of insanity has been presented during the trial, the court, where warranted by the evidence, shall also provide the jury with a special verdict form of guilty but mentally ill, as to each offense charged and shall separately instruct the jury that a special verdict of guilty but mentally ill may be returned instead of a general verdict ***."

Defendant acknowledges that an argument similar to the one he has

raised has been rejected by the appellate court and that the constitutionality of the GBMI statute has been upheld. (*People v. Fierer* (1987), 151 Ill. App. 3d 649, 653, 503 N.E.2d 594, *aff'd* (1988), 124 Ill. 2d 176, 529 N.E.2d 972, citing *People v. DeWit* (1984), 123 Ill. App. 3d 723, 463 N.E.2d 742.) However, defendant argues that this court should review the constitutionality of the statute. In support of his argument, defendant has quoted passages from the appellate and supreme court opinions in *People v. Fierer.* The appellate court stated:

> "[I]t remains to be seen, and only experience will show, whether a jury can formulate a clear and understandable conceptualization of the distinction between legal insanity and mental illness when reaching a verdict of GBMI." (*Fierer*, 151 Ill. App. 3d at 653.)

However, the court did not hold that this question was a basis for finding the statute unconstitutional. When the case was before the supreme court on the State's appeal, the court addressed a different issue regarding the GBMI statute than the one argued by defendant. The issue addressed by the court was the conflicting burden and standard of proof in the insanity and GBMI statutes, *i.e.*, defendant's burden of proving insanity by a preponderance of the evidence for a not guilty by reason of insanity verdict versus the State's burden of proving defendant's noninsanity beyond a reasonable doubt for a GBMI verdict. (*Fierer*, 124 Ill. 2d at 185.) The court noted the difficulty in formulating jury instructions that these conflicting standards created. It was in this context that the court made the following statement:

> "We invite the legislature to carefully review the interplay between these unclear and confusing statutes." (*Fierer*, 124 Ill. 2d at 191.)

Defendant has also used this passage in an attempt to bolster his argument regarding the unconstitutionality of the GBMI statute even though his argument varies from that of the *Fierer* court. We, thus, conclude that defendant's right to due process was not denied by the submission of a GBMI instruction to the jury.

■ ■ Defendant next contends that the trial court's failure to properly instruct the jury constituted plain error and denied defendant his right to a fair jury trial because the instruction failed to place the burden on the State to prove beyond a reasonable doubt not only that defendant committed the elements of the offense, but that he` was not insane and was mentally ill. The 1987 version of the GBMI statute, which was the version applicable to this case, provided that

the special verdict of GBMI required "a unanimous finding by the jury beyond a reasonable doubt that the defendant committed the acts charged and that defendant was not legally insane at the time of the commission of these acts but that he was mentally ill at such time." (Ill. Rev. Stat. 1987, ch. 38, par. 115—4(j).) Therefore, under this statute, the State bears the burden of proving defendant's noninsanity beyond a reasonable doubt. However, an instruction to the jury on the GBMI verdict is dependant on a defendant's presentation of the insanity defense at the trial. When defendant raises this defense, he bears the burden of proving his insanity by a preponderance of evidence. (Ill. Rev. Stat. 1987, ch. 38, pars. 3—2(b), 6—2(e).) Thus, a situation is created where the trial judge is required to formulate jury instructions based on two statutes which contain potentially conflicting provisions regarding the burden and standard of proof. (See *Fierer*, 124 Ill. 2d at 191.) It was under these circumstances that the trial judge in the instant case instructed the jury on the GBMI special verdict as follows:

> "If you find from your consideration of all the evidence that each one of these propositions has been proved beyond a reasonable doubt and that the defendant has not proved by a preponderance of the evidence that he was insane at the time of the offense, and you find that defendant was mentally ill at the time of the commission of the offense, you should find defendant guilty but mentally ill."

We conclude, as defendant contends, that this instruction was defective and constituted plain error because it failed to place the burden on the State to prove that defendant was not insane beyond a reasonable doubt.

■ The State argues that defendant has waived this issue because he failed to object to the instruction at the trial. The State further argues that the error in instruction was not plain error because the alteration made it more likely that the jury would have returned a verdict of guilty but mentally ill. In support of this argument, the State quotes the statement of the *Fierer* court that the modification in instruction in that case had "the undeniable effect of making the GBMI verdict easier to attain and more likely to result." (*Fierer*, 124 Ill. 2d at 187.) The State then claims that because the *Fierer* court found that the guilty but mentally ill verdict, which the jury returned in that case, was more harmful than a guilty verdict, the modified instruction was erroneous as it made the GBMI verdict easier to attain. However, what the *Fierer* court actually said was:

> "If the jury, properly instructed, had been unable to conclude

that defendant was sane beyond a reasonable doubt, it would have faced a more difficult choice between not guilty or guilty. We need not speculate as to the outcome of that decision-making process. It is enough to say that the altered GBMI instruction might have affected that outcome. Therefore, the alleged error cannot be viewed as harmless." (*Fierer*, 124 Ill. 2d at 187-88.)

Furthermore, *Fierer* is distinguishable because in that case, the only modification in the instruction was in the standard of proof. The relevant portion of the instruction stated:

" 'By a preponderance of the evidence that the defendant was sane at the time of the commission of that offense.' " (*Fierer*, 124 Ill. 2d at 186.)

The burden of proof still remained with the State. In the instant case the modified instruction not only altered the standard of proof but also placed the burden of proof on defendant rather than on the State. Therefore, the defect was substantial, and it was not waived by defendant's failure to make a timely objection.

The State also cites *People v. Cooney* (1985), 136 Ill. App. 3d 989, 484 N.E.2d 802, in support of its argument that the error in the jury instruction was harmless. However, *Cooney* is distinguishable because the error that the defendant in that case addressed was that an instruction on the GBMI verdict was given, not that the instruction was defective. Because the defendant was found guilty, the court concluded that he was not prejudiced by the improper instruction. In this case, the giving of an instruction on the GBMI verdict was proper, but the burden of proof as well as the standard of proof were improperly stated. We conclude that defendant was prejudiced by this alteration because it may have affected the outcome of the case. Thus, the error was not harmless. See *Fierer*, 124 Ill. 2d at 187-88.

Because this matter is being remanded for a new trial, we need not address the issue raised by defendant that he was deprived of his right to be found GBMI because the statute created a class of defendants who could not prove their insanity by a preponderance of the evidence but who also could not be found GBMI because the State could not prove their noninsanity beyond a reasonable doubt. This potential problem existed because the same statute held defendant and the State to different standards of proof. (See *Fierer*, 124 Ill. 2d at 189.) The statute has now been amended so that defendant has the burden of proving his insanity as well as his own mental illness by a preponderance of evidence. (Pub. Act 86—392, eff. Jan. 1, 1990.) However, on the retrial of this case, the jury will be instructed on the version of

the statute which was effective at the time that the offense was committed. (*People v. Eckhardt* (1987), 156 Ill. App. 3d 1077, 1080, 509 N.E.2d 1361.) Because the issue defendant raises may not be present if he is found not guilty, not guilty by reason of insanity, or GBMI on remand, we will not decide this issue at this time.

The issues of defendant's fitness to stand trial as well as the question of whether his conviction should be reduced to GBMI will also not be decided at this time. However, we will address the issues regarding the State's comments on defendant's silence as evidence of his sanity and the State's expert witness' misstatements of the law in order to avoid repetition of these errors on retrial.

Defendant contends that the State's use of his silence to prove that he was sane violated his right to due process and penalized him for exercising his *Miranda* rights. At the trial, the State elicited testimony that when defendant was given his *Miranda* warnings, he terminated his conversation with the police. During the presentation of his case, defendant relied on the insanity defense to respond to the charges against him. In its closing argument, the prosecutor made the following statements:

> "This is the guy who is just totally out of it? He is able to go ahead and give one story and then another story to the detective, and then finally he can say, well, I don't want to answer any more questions. And [*sic*] the officer stops asking [*sic*] questions. Well, you heard that the officer read him all his rights. Among these rights was that he still has the right to stop asking questions at any time and he does have that right, it's [*sic*] his Constitutional right and no problem with that. But how did he know that he does? Because the officer told him and he heard it from the officer and he understood it."

Both the United States and Illinois Supreme Courts have determined that it is fundamentally unfair for the prosecution to use defendant's post-*Miranda* silence as evidence of his sanity. (*People v. Stack* (1986), 112 Ill. 2d 301, 307, 493 N.E.2d 339, citing *Wainwright v. Greenfield* (1986), 474 U.S. 284, 88 L. Ed. 2d 623, 106 S. Ct. 634.) In this case, the State's reference to defendant's assertion of his right to remain silent as evidence of his sanity penalized him for exercising this right and destroyed its value to defendant. Although the State argues that defendant has waived this issue on appeal, a violation of a defendant's right to remain silent is plain error. (*People v. Robinson* (1976), 44 Ill. App. 3d 447, 449, 358 N.E.2d 43; *People v. Monaghan* (1976), 40 Ill. App. 3d 322, 326, 352 N.E.2d 295.) We also conclude, contrary to the State's argument, that the error was not harmless

and that the evidence of defendant's sanity or insanity was close. (See *People v. Anderson* (1986), 113 Ill. 2d 1, 495 N.E.2d 485.) For these reasons, we conclude that the State's reference to defendant's exercise of his *Miranda* rights as evidence of his sanity is reversible error.

Defendant also contends that the State's expert witness' misstatements of law as to defendant's burden of proof in establishing an insanity defense deprived him of a fair trial. The expert witness' testimony at issue was that of the State's expert witness, Dr. Mathew Markos. In his testimony regarding his professional education, Markos stated that he pursued specialization in forensic psychiatry, "also known as psychiatry and the law." He then stated that as part of his training in forensic psychiatry, he attended lectures in criminal law. The State then elicited testimony from the witness regarding the standards for legal insanity. Markos stated that Illinois used the standards of the American Law Institute (ALI) for the insanity defense. He testified that to establish the insanity defense:

> "[T]he evaluator or examiner has to prove beyond a reasonable doubt with a reasonable degree of medical certainty that the psychosis or the serious mental illness was directly linked to the commission of the criminal act."

Prior to this statement, Markos had testified:

> "[I]n order to prove the insanity defense with a reasonable degree of certainty—a reasonable degree is approximately 70 percent, roughly—one has to show that there was an existing mental illness, a serious mental illness, in other words, a psychosis."

At another point in his testimony Markos stated:

> "[T]he mere existence of a psychotic illness does not make somebody legally insane. It has to be shown beyond a reasonable doubt that as a result of this mental illness or psychosis he or she could not appreciate the criminality and was not able to conform his or [*sic*] behavior."

 █ It is essential that a jury be correctly informed of the burden of proof. (*People v. Lewis* (1969), 112 Ill. App. 2d 1, 13, 250 N.E.2d 812.) In order to establish an insanity defense, defendant is only required to show by a preponderance of evidence that he was insane at the time of the offense. (Ill. Rev. Stat. 1985, ch. 38, par. 6—2(e).) Therefore, Markos inaccurately stated the law and significantly heightened defendant's burden of proof by making references to the reasonable doubt standard and by attaching an erroneous numerical value of 70 percent to the standard. Although the jury was properly instructed as to the standard of proof by the trial court at the conclu-

sion of the trial, this did not cure the prejudice to defendant that may have resulted from the expert witness' improper statements. The likelihood that the jury was misled by these statements was increased by the fact that the witness testified as to his expertise in psychiatry and the law. (*People v. Eckhardt* (1984), 124 Ill. App. 3d 1041, 1043, 465 N.E.2d 107.) We also conclude that this issue was reviewable despite defendant's failure to object under the plain error rule, and that his failure to object may have even increased the magnitude of the error by leaving the jury with the impression that the witness correctly stated the law. (*Eckhardt*, 124 Ill. App. 3d at 1043.) Because we find that this error was prejudicial and that the evidence of defendant's sanity was close, we conclude that it was reversible error. (*People v. Johnson* (1981), 102 Ill. App. 3d 122, 129, 429 N.E.2d 905.) We also note that defendant has failed to address whether it was even proper for Dr. Markos to, in effect, instruct the jury on a matter of law. Because we have already determined that Dr. Markos' testimony caused reversible error, we decline to address this issue.

Accordingly, the judgment of the circuit court is reversed, and the cause is remanded for a new trial.

Reversed and remanded.

LaPORTA, P.J., and EGAN, J., concur.